DOROTHY W. MAHONEY, PETITIONER-APPELLANT AND CROSS-RESPONDENT, v. NITROFORM COMPANY, INC., RESPONDENT-RESPONDENT AND CROSS-APPELLANT.

HARRIET M. KRAEMER, PETITIONER-APPELLANT AND CROSS-RESPONDENT, v. NITROFORM COMPANY, INC., RESPONDENT-RESPONDENT AND CROSS-APPELLANT.

Argued January 3 and January 9, 1956—Decided January 30, 1956.

*Mr. Alexander Avidan* argued the causes for appellants-cross-respondents (*Messrs. Avidan & Avidan,* attorneys).

*Mr. Isidor Kalisch* argued the causes for respondent-cross-appellant.

The opinion of the court was delivered by
WILLIAM J. BRENNAN, JR., J. The Appellate Division reversed judgments of the Essex County Court sustaining workmen's compensation awards · for the dependents of Richard W. Mahoney and Edward C. Kraemer, respectively the president and the secretary-treasurer of Nitroform Company, Inc. Mahoney and Kraemer were killed on February 21, 1953 in an explosion and fire at the company's Newark plant at 444 Frelinghuysen Avenue. 36 *N. J. Super.* 116 (1955). We granted certification, 19 *N. J.* 336 and 337 (1955).

Each decedent held 25% of the company's issued stock, and a like percentage was held by Thomas J. Tully, vice-president in charge of research, and Leon I. Ross, vice-president in charge of sales.

502

There were separate trials of the two cases in the Division before different Deputy Directors. Tully testified at both trials and supplied the only proofs as to the corporate history and methods of operation and the arrangements with and among the incorporators. No corporate books or records were available at the trials because, according to Tully, minimum attention was given to record keeping and such records as were kept had either been destroyed in the explosion or had been seized by the authorities investigating the mishap.

Tully testified that he and his fellow officers organized Nitroform in 1952 to manufacture chemicals. The company's modest manufacturing quarters were leased at a rental of $100 per month. All work was done by the incorporators, primarily by Mahoney and Kraemer, except as on infrequent occasions casual labor was employed, usually relatives of the incorporators. For the purposes of this case, it is of especial importance that Mahoney and Kraemer did all the work incident to the production of the chemicals manufactured by the concern.

The four men gave only spare time to the business, as each held regular employment elsewhere. Mahoney was a production chemist at Merck & Company, Rahway, working a 44-hour week at an annual salary of $4,944, or $95.08 per week. Kraemer was custodian of the chemical stockroom at the Newark College of Engineering, receiving $4,088 per year, or approximately $80 per week. Tully was an associate professor of chemistry at the Newark College of Engineering and, while not too clear from the record, it appears that Ross was in the investment business. Neither Tully nor Ross spent much time at the Nitroform plant, but Mahoney and Kraemer averaged 20 hours per week, working nights, Saturdays, Sundays and holidays.

At the time of the accident only one product was being manufactured, a highly explosive compound called tetranitromethane, a very profitable item, produced at a cost of 90 cents per pound and selling at from $15 to $30 per pound,

depending upon quantity. The company's customers for the compound were armed service contractors.

None of the four incorporators drew any money from the company as salary, wages, dividends or otherwise. The corporation, however, had $1,087.73 in the bank at the time of the accident and also an unspecified amount of accounts receivable.

Tully testified, in substance, that the four incorporators agreed that none would draw anything until the enterprise prospered more substantially but that when that time arrived each would be paid from corporate funds the reasonable value of his services, that value in the cases of Mahoney and Kraemer to be measured at the rate of their respective earnings in their regular employments.

The Mahoney petition was heard before Deputy Director Medinets in December 1953, and the Kraemer petition before Deputy Director Umberger in April 1954. The workmen's compensation risk for Nitroform was an assigned risk to the carrier providing the insurance. The assignment was made pursuant to the "New Jersey Plan for the Granting of Workmen's Compensation Insurance to Employers Unable to Secure it for Themselves," approved by the Commissioner of Banking and Insurance and administered by the Compensation Rating and Inspections Bureau of New Jersey. The carrier, on behalf of Nitroform, filed answers to the widows' petitions which, under oath, admitted that the decedents were in the "employ" of Nitroform at the time of the accident. A like admission as to Kraemer particularly was made in the Kraemer case in a pretrial order entered in that case before the trial in the Division. At both trials, however, leave was sought to withdraw the admissions of employment and such leave was granted, formally in the Kraemer case, and substantially, if informally, in the Mahoney case. No proofs of any kind were offered in support of the defense. But respondent contends that the petitioners did not sustain their burden of proof to establish statutory employment, insisting that the testimony of Tully, if sufficient to support an inference of employment, was so inconsistent with the

contents of a statement signed by him 12 days after the accident as not to be believed. The statement was prepared by the carrier's investigator following an interview with Tully.

The Division and the County Court found that Tully's testimony was worthy of belief, and concurred in a finding that Mahoney and Kraemer were "working officers" and thus employees within the definition of *R. S.* 34:15–36, namely, " 'employee' is synonymous with servant, and includes all natural persons who perform services for another for financial consideration * * *." Judge Foley in the County Court did not perceive "any great conflict between the [Tully] statement and the witness's account of the agreement." Moreover, he cogently observed:

> "It strains one's credulity to suppose that Mahoney during the thirty-two weeks of the company's existence should have steadily contributed an average of twenty hours per week of his time and the effort and skill required by the exacting tasks he performed, without any thought of recompense. Equally difficult is it to assume that Tully and Ross, who shared none of the burdens that Mahoney and Kraemer shouldered in turning out the company's product would have expected them to serve without pay. Was the promise of full-time employment sufficient reward for all these labors? The facts supply a negative answer."

█ Neither the Appellate Division nor the respondent seems to question Tully's evidence that Mahoney and Kraemer constituted the respondent's production force or that it may reasonably be inferred that the company's receipts represented the proceeds of sales of products manufactured by the two men. This would ordinarily suffice to bring the decedents within the act, for, as the Appellate Division acknowledged, it is settled law in our State that when corporate officers perform work which if performed by anyone else would confer employee status for the purposes of the Workmen's Compensation Act the officers have that status. *Adam Black & Sons, Inc., v. Court of Common Pleas,* 8 *N. J. Misc.* 442 (*Sup. Ct.* 1930); *Strang v. Strang Electric Co.,* 8 *N. J. Misc.* 873 (*Sup. Ct.* 1930); *Hannaford v. Central R. Co. of*

*New Jersey*, 115 *N. J. L.* 573, 576 (*Sup. Ct.* 1935), affirmed 116 *N. J. L.* 412 (*E. & A.* 1936); see also *Goldmann v. Johanna Farms, Inc.*, 26 *N. J. Super.* 550 (*Cty. Ct.* 1953); *cf. Bowne v. S. W. Bowne Co.*, 221 *N. Y.* 28, 116 *N. E.* 364 (*Ct. App.* 1917), and *Carville v. A. F. Bornot & Co.*, 288 *Pa.* 104, 135 *A.* 652 (*Sup. Ct.* 1927), where compensation was denied only because the duties performed were executive services merely.

The Appellate Division, however, was of the view that the petitioners had failed to show the essentials of the statutory employment relationship of control by the corporation of the manner and method by which the production work was done and that Mahoney and Kraemer had the expectation that the corporation would compensate them for their labor. It was said that the "alleged 'employee[s]' [were] entirely free from control or direction," that each was "free to come and go when he chose and to render such service as might be convenient for him at his indeterminate volition," 36 *N. J. Super., page* 127, and that Tully's statement signed after the accident is "instinct with the affirmation that the men had no pecuniary claims against the respondent at any time but only a hope that by their voluntary efforts the company would prosper sufficiently to give them full time jobs eventually." 36 *N. J. Super., page* 125. Tully's testimony was found to be "vague, inconsistent, unconvincing and biased" and a "transparent attempt to fabricate a basis for recovery," *page* 125. The conclusion of ultimate fact was therefore that each decedent was merely "an autonomous member of what was in effect a joint venture, identified as a corporation by nothing more than a bare form of organization," *page* 127.

■ Thus, in effect, the Appellate Division evaluated the evidence as justifying a complete disregard of the corporate entity, an action which in our view was clearly erroneous. The respondent did not take that extreme position but under oath admitted in its answers that the decedents were in the "employ" of Nitroform for the purposes of coverage under the act. The withdrawal of those admissions at the trials

were not based upon any contention that the labor of Mahoney and Kraemer was not rendered on behalf of the corporation but was founded upon the insistence that there was no expectation of payment for the work .and thus that the statutory element of "financial consideration" was not proved. Despite the withdrawal of the admissions, they still carried evidential weight, certainly sufficient upon this record to withstand any inference that the work done was not in fact done for the corporation. *Cf. New Amsterdam Casualty Co. v. Popovich,* 18 *N. J.* 218, 224 (1955); *Hinz v. Western Electric Co., Inc.,* 9 *N. J. Super.* 93 (*App. Div.* 1950); *Osborne v. Consolidated Stone & Sand Co.,* 109 *N. J. L.* 590 (*Sup. Ct.* 1932); *Lincks v. Erie Railroad Co.,* 97 *N. J. L.* °343 (*E. & A.* 1922); *Presslaff v. Gallo,* 114 *N. J. L.* 276 (*E. & A.* 1935); 4 *Wigmore, Evidence* (*3d ed.* 1940), *sec.* 1067 (5), *p.* 61; 14 *A. L. R.* 65; 90 *A. L. R.* 1393, 1403. Moreover, the disregard of the corporate entity cannot be reconciled with the conceded fact that the corporation received and retained the proceeds of the sales of the products manufactured by the two men. Too, it is clear that such proceeds were beyond the power of Mahoney and Kraemer to command, except as they had the concurrence of at least one of the other stockholder-officers.

And the element of control essential to the employment relation is not absent here. The decedents did not have it in their power, alone or in combination, to overrule their fellow stockholders. Rather, each was in a position where the other three could combine to exercise control over him through corporate action. Control was not in fact exercised, but the control test is satisfied when the employer has the *right* of control, and it is not requisite to prove its actual exercise. 1 *Larson, Workmen's Compensation, sec.* 44.10, *p.* 638; *sec.* 44.32, *p.* 645.

We turn then to the contention which was the basis of respondent's defense at the trials, that Mahoney and Kraemer had no expectation of payment from the corporation for their work but did what they did solely in the hope that the venture might prosper sufficiently to enable them to quit their regu-

lar employment and devote all their time to Nitroform at salaries to be determined at that time.

As noted, Judge Foley in the County Court thought the circumstances were such as to exhibit a reasonable and proper expectation on the part of Mahoney and Kraemer that the corporation would compensate them for their work before any monies would be distributed to the stockholders as such. *Cf. Disbrow v. Durand,* 54 *N. J. L.* 343, 345 (*E. & A.* 1892). The Appellate Division queried whether, even so, "financial consideration" required by the statute is proved "where payment is contingent upon an event which may never occur and had not occurred when the accident transpired," 36 *N. J. Super., pages* 126, 127. But "* * * the possibility that the condition may happen involves a chance of detriment which is sufficient to make the promise valid consideration," 1 *Williston, Contracts (rev. ed.* 1936), *sec.* 119, *p.* 413; and see *Dunbaden v. Castles Ice Cream Co.,* 103 *N. J. L.* 427, 433 (*E. & A.* 1927).

The primary basis of the Appellate Division's conclusion that the decedents expected no payment from the corporation was, however, the court's disbelief of Tully's affirmative testimony in that regard because of its supposed inconsistency with the contents of his signed statement. We have studied the statement and, like the Division and the County Court, we find no such conflict with Tully's testimony as to warrant disbelief of the testimony. At all events, nothing in the statement justified, in our view, the exercise by the Appellate Division of its power independently to find the facts and overturn the contrary conclusion reached by both the Division and the County Court. While there is inconsistency in some respects between the contents of the statement and Tully's testimony, the two are not so glaringly irreconcilable as to constitute the concurring findings of the Division and the County Court "palpably erroneous," *Temple v. Storch Trucking Co.,* 3 *N. J.* 42, 48 (1949), and "so plainly unjustified by the evidence that the interests of justice necessitated their nullification," *Trusky v. Ford Motor Co.,* 19 *N. J. Super.* 100, 103–104 (*App. Div.* 1952). It is

significant that the respondent originally found nothing in the statement negativing an expectation of payment from the corporation. Although the statement was obtained on March 5, 1953, the respondent's sworn answers filed in September, six months later, admitted that the decedents were in its "employ" for all purposes of coverage under the act.

We comment in passing that the Appellate Division's characterization of the statement as "instinct with the affirmation that the men had no pecuniary claims against the respondent" implies reliance upon the statement's contents as substantive evidence in the case. If so, this was error. Any inconsistencies between the contents of the statement and Tully's testimony were useful solely in the determination of the credit to be given to that testimony. *Kulinka .v. Flockhart Foundry Co.*, 9 *N. J. Super.* 495, 500–501 (*Cty. Ct.* 1950), affirmed *sub nom. Bujalski v. Flockhart Foundry Co.*, 16 *N. J. Super.* 249, 250 (*App. Div.* 1951), certification denied 8 *N. J.* 505 (1952).

We thus conclude that the Appellate Division erred in reversing the judgment of the County Court on the ground that the statutory employment relationship was not proved.

Another issue raised by respondent in its appeal to the Appellate Division, but not decided because of the basis of the reversal, is presented by respondent's cross-petitions for certification. This issue is whether the dependency awards were properly computed on the basis of Mahoney's weekly salary of $95.08 at Merck & Company, and Kraemer's weekly salary of $80 at the Newark College of Engineering.

It was stipulated in the Mahoney case that his weekly rate at Merck & Company was $95.08. No stipulation appears in the Kraemer case, but it was found on ample evidence that the reasonable wage for his services for Nitroform was comparable to his salary at the College which, reduced to an hourly and daily basis, is $2 per hour for an eight-hour day, or $80 per five-day week. The petitioner in the Mahoney case was entitled to an award of 40% of the applicable wage or the statutory maximum of $25 per week where 40% of the wage exceeds that sum. As 40% of $95.08 is more than

$25, the award was for the maximum. Similarly, the petitioner in the Kraemer case was entitled to an award of 45% of the applicable wage or the statutory maximum, and as 45% of $80 exceeds $25, the maximum was allowed. *R. S.* 34:15–13(*k*).

Respondent contends that the percentages should have been applied to wages computed on the basis of 20 hours per week divided into five four-hour days. On that basis, Mahoney's weekly wage would have been $43.20 per week, of which 40% is $17.28, and Kraemer's wage would have been $40 per week, of which 45% is $18.

The governing statute is *R. S.* 34:15–37 which, in pertinent part, provides:

"Where the rate of wages is fixed by the hour, the daily wage shall be found by multiplying the hourly rate by the customary number of working hours constituting an ordinary day in the character of the work involved. In any case the weekly wage shall be found by multiplying the daily wage by five * * *. Five days shall constitute a minimum week."

We think the computation based on the weekly wages of the decedents at their regular employments was within the purview of the statute. Basically a calculation determined at the weekly rate is what the statute requires. Such was the decision of our former Court of Errors and Appeals in *Bennett v. Fertig*, 110 *N. J. L.* 510 (1933), affirming 10 *N. J. Misc.* 1021 (*Sup. Ct.* 1932), where an employee working two days per week at $1.50 per eight-hour day was allowed compensation based upon five days or $7.50 per week. The underlying policy of the provision for wage calculation is to compensate the employee (or, here, the dependents) for the future economic loss incident to the accident. 2 *Larson, supra, sec.* 60.11, *p.* 71, states the applicable principles:

"* * * The entire objective of wage calculation is to arrive at a fair approximation of claimant's probable future economic capacity. His disability reaches into the future, not the past; his loss as a result of injury must be thought of in terms of its impact on probable

future earnings, perhaps for the rest of his life. This may sound like belaboring the obvious; but unless the elementary guiding principle is kept constantly in mind while dealing with wage calculation, there may be a temptation to lapse into the fallacy of supposing that compensation theory is necessarily satisfied when a mechanical representation of this claimant's own earnings in some arbitrary past period has been used as a wage basis."

And this concept is discernible in the several decisions of our courts however the statute has been phrased from time to time. See *Schaeffer v. De Grottola*, 85 *N. J. L.* 444 (*Sup. Ct.* 1914); *Smolenski v. Eastern Coal Dock Co.*, 87 *N. J. L.* 26 (*Sup. Ct.* 1915), affirmed 88 *N. J. L.* 387 (*E. & A.* 1915); *Jordan v. Lindeman & Co., Inc.*, 23 *N. J. Misc.* 194 (*C. P.* 1945).

But respondent argues that decedents' average work week for Nitroform was 20 hours, and relies on the decision of the former Essex County Court of Common Pleas in *Langheld v. Federal Shipbuilding &c. Co.*, 25 *N. J. Misc.* 159 (1947), where in the case of a part-time canteen worker who worked four hours daily compensation was allowed upon the four-hour basis, it being held that the statutory provision calling for the multiplication of the hourly rate "by the customary number of working hours constituting an ordinary day in the character of the work involved" meant an ordinary day "in the petitioner's experience during the period of her employment with respondent."

However proper the determination in the *Langheld* case in the factual setting there presented, any limitation in the instant cases based upon the decedents' employment with Nitroform and ignoring their contemporaneous full-time employments would obviously frustrate the objective of wage calculation sought to be attained by the statute. Any reasonable calculation of the decedents' probable future earning capacity must necessarily take into account their wages in their contemporaneous full-time employments, and it seems clear to us that such is the intent of the statute.

The judgments of the Essex County Court are reinstated, and the judgments of the Appellate Division are reversed.

*For reversal*—Chief Justice VANDERBILT, and Justices WACHENFELD, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—None.