88 N.J. Super. 69 (1965)
210 A.2d 782
ANN BAGINSKY, PETITIONER-APPELLANT,
v.
AMERICAN SMELTING & REFINING CO., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1965.
Decided May 28, 1965.
*71 Before Judges CONFORD, KILKENNY and LEWIS.
Mr. Seymour B. Jacobs argued the cause for appellant (Messrs. Balk & Jacobs, attorneys).
Mr. Francis M. Seaman argued the cause for respondent (Messrs. Seaman & Clark, attorneys; Mr. John P. Kozak, on the brief).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is a workmen's compensation "heart" case. Recovery was allowed by the Division of Workmen's Compensation but denied on appeal to the Middlesex County Court. Novel applications of the doctrine of Dwyer v. Ford Motor Co., 36 N.J. 487 (1962), are projected by the present appeal of petitioner.
Petitioner's husband, Walter Baginsky, employed by respondent since 1939 as a crane operator, died suddenly at home after collapsing while dialing a telephone number, on the late afternoon of Saturday, February 20, 1960. He had left work as usual the preceding evening at about 10:45 P.M., had an uneventful night, and spent part of the day of his demise driving his wife to market and to visit a married daughter. He was relaxed at home, doing nothing, for about an hour and a quarter before the fatal collapse.
The decedent began to develop symptoms of hypertension in 1954. By 1958 there was clear evidence not only of marked hypertension but also of arteriosclerotic cardiovascular degeneration, *72 as well as congestive heart disease with enlargement of both sides of the heart and decompensation, edema of chest and legs, rales, and shortness of breath. Although these conditions generally progressed until the time of his death, decedent did not miss any time from his work (apart from regular vacations), which he apparently performed satisfactorily at all times. However, he was physically relieved by enforced inactivity during a strike and shut-down of the plant from August 20, 1959 to December 10, 1959, and by a one-week vacation which he took in late January 1960 because he did not feel well enough to work at the beginning of that week.
Respondent's expert medical testimony was to the effect that decedent's death on February 20, 1960 was due to a coronary occlusion, traceable to his arteriosclerotic condition, which was independent of the general congestive heart disease; there was no causal connection with his work. A medical expert for petitioner gave the opinion that the death was simply the end result of the congestive heart disease, not the result of a coronary occlusion, and that there was causal contribution to the death by the employment in that the nature of the work was contra-indicated by the petitioner's condition and he died much earlier than he would have, had he abstained from such work. On the issues thus drawn the tribunals of first instance arrived at the opposite results hereinabove indicated. The judge in compensation was essentially in accord with the opinion of the petitioner's medical expert.
In an able and perceptive opinion for the Middlesex County Court, Baginsky v. American Smelt. & Refin. Co., 81 N.J. Super. 75 (1963), Judge Molineux concluded that although the evidence justified the medical conclusion that decedent's work-effort as an entirety over the years aggravated his congestive heart disease, it did not contribute to his death as that was the result only of a coronary occlusion and not of congestive heart failure. The judge supplemented that primary basis for his decision with the view that if in fact the evidence justified the medical conclusion that the death was caused by the congestive heart disease and not by a coronary occlusion, *73 recovery could still not be justified, even within the authority of the Dwyer opinion, supra. The reason given was that to allow compensation on the basis of an asserted causative work history over as extended a period as here, unaccompanied by any "moment of manifestation" of the heart ailment "appreciably near to the attack resulting in death" (not here present) "would for all practical purposes constitute a holding by this court that congestive heart failure is an occupational disease." The judge did not conceive that Dwyer "meant to go that far." (81 N.J. Super., at pp. 86-87)
Our own close appraisal of the record in this case, in the light of the controlling cases, principally Dwyer, leads us to essential agreement with the first above-stated basis for Judge Molineux's determination, making it unnecessary for us to express any view as to the merits of the interesting second and supplementary thesis in support of the result arrived at.
Before proceeding to a more detailed exploration of the evidence we take cognizance of the criteria by which we are to be guided, as painstakingly set out in Dwyer. The court stated:
"Has it been shown by evidence, opinion or otherwise, that the exertion attendant upon the duties of employment, no matter how slight or how strenuous, and no matter with what other factors, such as preexisting disease or predisposition to attack, it may be combined, was sufficient to contribute toward the attack or its aggravation? In short, where the heart has deteriorated to the point that potentially any appreciable degree of exertion carries a danger of precipitating, or so acting upon the condition as to accelerate, a disabling or fatal attack, if the effort or strain, which in fact precipitates or contributes to the attack, occurs during the course of the employment and as an ordinary or usual incident of the work, the resulting disability or death is compensable." (36 N.J., at p. 492)
The burden of proof of the petitioner is described as follows:
"Naturally, the onus of establishing connection between a heart attack death and the work effort rests on the compensation claimant. The burden has been described in various ways but may be stated concisely in this fashion: Such claimant has the burden of showing by the preponderance of the believable evidence that the ordinary *74 work effort or strain in reasonable probability contributed in some material degree to the precipitation, aggravation or acceleration of the existing heart disease and the death therefrom. In this context, the significance of `some material degree' cannot be stated with mathematical precision. It means an appreciable degree; a degree greater than de minimis; it means that there was some employment exertion capable medically of helping the attack  of furthering its progress." (at pp. 493-494)
Coordinate with the liberality of the substantive principles thus stated is the firmness of the court's insistence as "generally * * * indispensable" on medical proof of causal connection not merely in general conclusionary terms but by "[e]xplanation of the physiological reactions of the diseased or ailing heart to the work strain in terms of sole or contributory cause and effect * * *." (Id., at pp. 494-495). See also Schiffres v. Kittatinny Lodge, Inc., 39 N.J. 139, 147, 155 (1963), rejecting as unpersuasive medical testimony that a coronary infarction necessarily always has a causal relationship with any later coronary infarction of the same person.
The decedent's job was to run a crane involving manipulation of any of some six levers and foot control of three pedals. The effort was said to be comparable to moving the gear shift and applying the mechanical brakes of a car. The work was done in a seated position. The weight of the loads moved by the crane did not affect the labor of operating it. There was varying testimony as to the height of the crane cab above the ground  from 5 1/2 to 7 feet. Access to the cab was by climbing several rungs mounted vertically, with the aid of side bars for hand-holds. The workday was from 3 P.M. to about 11 P.M., broken by a one-hour lunch period taken near the crane. Decedent was required to walk about a half-mile from the employees' parking yard to the crane, and back again at the end of the day's stint. There was a downward grade en route to the crane of between 22 and 26 feet. There were several ways to traverse this distance, some less difficult than others. Which the decedent used was not established.
A son of decedent who also worked for respondent saw him at the entrance gate after the shifts each night during a work *75 week two weeks prior to February 20, 1960, and testified decedent was out of breath from five to ten minutes after the walk from the crane. But the substance of the testimony of several of decedent's co-workers was that during and at the end of his last work day he looked well, was in good spirits, and had no shortness of breath or other complaints of any kind. He asked one of them to have beer and clams with him after work, but the invitation was declined.
Petitioner testified in support of her claim. Decedent had worked for respondent since 1939. For many years until 1957 he also did casual part-time trucking for a coal and fuel concern. In 1958 petitioner noticed that decedent's legs were swollen; he had gurgling noises in his chest; he had trouble breathing, especially after coming home from work and while in bed, and he was tired all the time. These conditions got worse. In August 1958 the plant doctor sent him to be examined at Roosevelt Hospital. Nevertheless, decedent kept on working; but he got treatment from the plant doctors, particularly injections and pills. Before 1958 decedent would walk the short distance from home to work, but beginning that year he no longer could, and he began to drive. On January 19, 1960 decedent left for work but returned before he got there because he was very short of breath. Petitioner phoned the plant to request sick leave or a three-week vacation for decedent, but he was allowed only one week. The plant doctor gave him injections that week, and decedent felt better when he returned to work, but he again became "bad," developing "burps" along with the other complaints noted.
On February 20, 1960, a Saturday "day-off," decedent had breakfast at 9 A.M. after a night of rest about which petitioner recounted nothing of note in her testimony. He then sat around doing nothing the rest of the morning. At noon he drove his wife two or three miles to a supermarket where they did the weekly shopping. He carried no bundles; she said he never did  "he couldn't." From there, at about 1 P.M., they drove three miles to visit their daughter and grandchildren. The daughter later testified that decedent came into *76 the house "very, very tired" and was out of breath from climbing the two steps to the front door. He just sat there, did nothing, ate nothing, and the couple left for their own home at 2:30 P.M., arriving there at 2:45 P.M. Petitioner carried the groceries into the house. Entrance into the house involved climbing six steps. At home, decedent sat doing nothing until 4 P.M., when he walked over to the telephone, started to dial, and collapsed without any prior warning of illness or discomfort.
Petitioner phoned the first aid squad, which came at once and administered oxygen to decedent. Shortly thereafter Dr. Urbanski, one of the plant physicians who had been treating decedent, came and pronounced him dead. He made out a death certificate which stated the cause of death as follows: "Acute coronary occlusion, instant; arteriosclerotic hypertensive cardiovascular disease (2 years)." There was no autopsy.
There were introduced into evidence extensive plant medical records indicating treatment of decedent for various ailments  latterly mainly hypertensive and cardiovascular  by both plant physicians, Dr. Urbanski and Dr. Brezinski. These records indicated that beginning in 1954 there were nosebleeds, apparently symptomatic of elevated blood pressure. In addition to the other conditions noted above, by 1959 there was also liver cirrhosis. Also in evidence was a report from Roosevelt Hospital in Metuchen, dated September 2, 1958, containing X-ray findings of the chest denoting pulmonary emphysema and marked enlargement of the heart on both sides. The report also indicated edema of the lower extremities. The recorded "impression" was one of "cardiac enlargement with decompensation. Pulmonary congestion." There was a recommendation of "hospitalization (preferably in a general hospital)" and that decedent have a "re-x-ray of chest in two months." However, decedent was never hospitalized nor X-rayed again. Petitioner testified she confronted Dr. Urbanski after her husband's death with the Roosevelt Hospital report and asked why decedent had not been hospitalized, whereupon the doctor replied that decedent "was going to die *77 anyway"; that if all the sick men at the plant were put in the hospital there would be "no men to work." But Dr. Brezinski testified that he intermittently discussed hospitalization or rest periods with decedent when his symptoms were distressing, but that decedent "didn't want to go in. He didn't have any money and he didn't feel that bad." One such discussion was when the Roosevelt Hospital report was received.
Petitioner's case for causal connection between work effort and death was based on the opinion testimony of Dr. Saul Lieb, an internist. He had not examined the decedent in his lifetime but gave his opinion on the basis of an inspection of the records in the case and a hypothetical question. He said decedent had a condition of "congestive heart failure" of "severe degree" by August 1958; that there was failure on both sides of the heart; that decedent should not have been permitted to "do any heavy physical exertion thereafter"; that while the medication administered was beneficial, "the mainstay of treatment is rest and avoidance of any heavy physical exertion." The work done by decedent, specifically the walks back and forth from gate to crane, climbing the ladder to the seat and manipulating the crane, "had an adverse effect upon this heart disease to increase the extent of his congestive heart failure * * * there was aggravation."
Dr. Lieb made a special point of noting, from the hypothetical question, that there was a medical finding of liver cirrhosis on December 26, 1959, which he implied indicated that the resumption of work by decedent in December 1959 after the strike produced "further increase in his heart failure." However, this deduction founders on the fact that the record indicates the finding in question was made on January 26, 1959  not December 26.
Dr. Lieb summed up his hypothesis as follows:
"From the description of his death on February 20, 1960, it is my opinion that this merely represented the end result of the man in severe congestive heart failure secondary to hypertensive and arteriosclerotic heart disease. And I feel that his work which he performed in the period from 1958 on, until the day before his death, certainly *78 was a major contributing factor in the aggravation and acceleration of his heart disease, to increase the extent of his congestive heart failure. So that he died as an end result of that congestive heart failure.
I feel very definitely that this man died much sooner than he would have otherwise than if he had not been subjected to heavy physical exertion after 1958. From my experience in this type of case, he may have gone on for many years with proper rest and treatment."
The doctor was further asked, on direct examination:
"Q. Doctor, what is your opinion as to the exact mechanism of death in this case on the basis of all the facts as you have them? A. From all the facts that I have, he just reached the end stage of his congestive heart failure. People can go into congestive heart failure and they will withstand it for a certain period of time, and they finally reach an end point. He reached an end point, of course, but he reached the end point much sooner than what he would have otherwise."
On cross-examination Dr. Lieb rejected the theory that the cause of death was a coronary occlusion. He also denied that the instantaneous nature of the death militated against the theory of death from congestive heart failure. He was asked:
"Q. The fact of the matter is that if this man had died from congestive heart failure, wouldn't there have been evidence of pulmonary edema?
A. No, not necessarily.
Q. There wouldn't be? A. No.
Q. Wouldn't there be evidence of formation of mucus in the lungs and in the mouth and in the nose?
A. No. That is where there is acute left heart failure; but where one has chronic congestive heart failure and one dies suddenly, that is not the case.
Q. Wouldn't there have been evidence of mucus or saliva coming out of the nose or mouth if he had in fact died of congestive heart failure? A. No, that is an acute left ventricular failure."
He refused on cross-examination to answer directly an amendment of the hypothetical question incorporating the observations of the fellow-workers who saw decedent the last day of work and testified he appeared to them to be in good health and good spirits, to have good color, and that he had *79 no complaints when quitting work. The doctor stated these descriptions did not "make too much sense" as against the fact that the man then had congestive heart failure and died the next day.
Dr. Jerome G. Kaufman, a cardiologist, also testifying solely on the basis of a hypothetical question, stated "it is my opinion that this man died, had a sudden death as the result of an acute coronary occlusion based on the arteriosclerotic nature of the coronary vessels * * *. This is known as occlusive coronary arteriosclerosis." It was the doctor's opinion that in view of the place and circumstances of the death, the interval which elapsed between any work effort and the time of death as well as the suddenness of it, there was no relationship between the work and the death. He stated, further:
"Q. Do you find anything in this case which specifically evidenced a worsening of this man's condition due to his work rather than the natural progress of the disease alone? A. Well, as far as the progress of the disease is concerned, his work may have affected him; but as far as his death is concerned, I think he had an independent death when he closed off a vessel at home."
On cross-examination, Dr. Kaufman discussed the physiological and symptomatic concomitants of a simple death as the end-result of congestive heart failure (cardiac decompensation) as contrasted with a sudden death due solely to coronary occlusion, which he had said was the case here.
He testified:
"Q. Doctor, death can come about as a result of a gradual worsening of congestive heart failure, can it not? A. Untreated, yes. Today, with modern treatment, it's not as common because I believe you can reverse about 90 per cent of serious cardiac decompensation.
Q. If they are properly treated? A. Yes.
Q. But if they are not properly treated and the condition gets worse, what is the mechanism of death? A. Well, the patient gets progressive weakening of the myocardium until it finally fails, and this is over a slow process, with fluid in the chest and with shortness of breath and fluid in the pleural cavities and fluid in the abdomen and fluid all over, until the patient just peters out.
*80 Q. And he just dies, does he not? A. He just peters out slowly.
Q. And there comes a time when the patient may slump over and die? A. Well, this kind of a patient doesn't slump over and die just like that. He is a patient who by that time is so sick that he is usually in a hospital or in a bed under treatment until he gradually peters out.
Q. Well, he is usually in a hospital if he is sent to a hospital? A. Yes, or in bed.
Q. But he can die suddenly, can he not? A. Well, it is most unusual for a patient with cardiac decompensation to die suddenly, if you are using `suddenly' as we speak of in acute occlusion. This is not a common picture.
Q. Can he die within a matter of a half hour or so? A. I think it's possible that he could die within a half hour or so if he presented certain things that would go along with it.
Q. And particularly, Doctor, is it possible that he could die within a half hour or so if he just had an exertion which brought on an episode of shortness of breath? A. If he had an exertion, he had shortness of breath, if he had rales, if he had frothing at the mouth, if he had coughing up of fluid and things like that, I couldn't deny it.
Q. Doctor, you are not saying that in all cases where a person dies of cardiac decompensation or congestive heart failure, that he would be frothing up at the mouth? A. If he had died suddenly, I think almost in all cases, he would.
Q. If the death  A. Unless he had an acute dilatation, then I don't think he would die that suddenly, that's all, but it's possible.
Q. If he had an acute dilatation, how long would it take today? A. I think these patients today live several hours."
As to death from dilatation (a theory not projected by Dr. Lieb), petitioner sought on cross-examination of Dr. Kaufman to establish the possibility that such dilatation had resulted from the fact that decedent "had just walked up a flight of six steps." (This was an apparent reference to the steps of decedent's home; but death occurred well over an hour after decedent had climbed those steps without any intervening distress.) The doctor said: "Yes, if he were in decompensation and walked up six steps, it would be an added burden to his effort."
Dr. Kaufman testified further, on cross-examination, that the basic cause of decedent's underlying heart condition here was hypertension and arteriosclerosis, which at first produced left ventricular failure. This led to pulmonary involvement which, in turn, exerted back-pressure upon the right ventricle, *81 causing it to fail. The liver condition and edema of the legs were signs of right heart failure. The doctor conceded that on the occasions when, from the history, decedent was in distress, he would have recommended rest rather than work. But he said the good work record indicated that the treatment decedent had been given had kept him "compensated."
Dr. Asher Yaguda, a pathologist, also testified for respondent on the basis of a hypothetical question that decedent died from an acute coronary occlusion and that there was no causal relationship between his work and his death. The occlusion was "the result of the natural progression of the arteriosclerotic disease," unrelated to any effort or to the decedent's congestive heart disease.
Dr. Urbanski testified, for respondent, that decedent had died from an acute coronary occlusion and not from congestive heart failure. He based this opinion on the suddenness of the death and the absence of any "edematous discharge from his nose, from his mouth" at the time. He stated that he had treated decedent eight times during the long strike in 1959, but that the patient did not improve despite the rest. The condition "was progressive." It was the opinion of the witness that the death was not related to the employment.
Having reviewed the important evidence in the case, we attempt to discern therefrom, in conformity with Dwyer, whether petitioner has sustained her burden of establishing as a matter of probability that decedent's work effort played a material role in causing, contributing to or accelerating his death. We emphasize the death, because compensation is here sought for that event and not for disability attendant upon heart disease or a heart attack. Whether decedent's cumulative work effort advanced the condition of his general congestive heart disease is thus not of itself relevant here unless the death was the mere simple end result of that disease, as theorized by Dr. Lieb. We find it was not.
The informative and carefully reasoned physiological explanations in the testimony of Dr. Kaufman, against the background of the objective facts, persuade us that death *82 here was the result of an acute coronary occlusion, and not the mere end result of the congestive heart disease. Dr. Lieb's explanation of the absence of edematous discharge at the time of death, consistently with his theory of death from simple heart failure  that such occurs only with "acute left heart failure"  does not persuade us. We find more convincing Dr. Kaufman's opposing thesis that the more probable and typical picture (although concededly not exclusive) in simple death as the end result of congestive heart failure is a slower death, in bed, with ultimate edematous discharge, shortness of breath or rales, as contrasted with the sudden death which occurred here unaccompanied by the stated symptoms. Dr. Urbanski supports that theory. We consequently find ourselves persuaded of the soundness of Dr. Kaufman's conclusion, supported by those of respondent's other medical experts, at least in terms of the preponderance of probabilities, that this was a case of death from coronary occlusion independent of and free from causal relationship with decedent's general congestive heart disease.
In the last-stated regard, assuming a proper finding of death from coronary occlusion, we have no real remaining issue here since, as expressly conceded by petitioner's counsel at oral argument, there is no evidence in this record that the congestive heart disease caused or contributed to the coronary occlusion; nor does he argue for that conclusion. Reliance is had exclusively on the theory of death as the simple end result of congestive heart disease, based upon Dr. Lieb's testimony.
We consequently find and determine that petitioner has not here established by a preponderance of the evidential probabilities a case of work-connected death. She is therefore not entitled to compensation.
There remains for consideration the alternative claim by petitioner that respondent, through its plant doctors, upon assumption to render or procure medical aid for decedent, negligently failed to do so, thereby contributing to his death, and becoming liable for compensation under the "humane *83 doctrine" expressed in Dudley v. Victor Lynn Lines, Inc., 32 N.J. 479 (1960).
This contention is raised for the first time on appeal; yet petitioner fails to apprise the court of that fact in the "Statement of Questions Involved" in her brief, as mandatorily required by R.R. 1:7-1(c). Indeed, petitioner's brief in the County Court expressly declared that the question there presented did not "involve a review of the adequacy and scope of the medical treatment provided by the Respondent's physicians." Under settled principles of scope of appellate review in workmen's compensation, the point argued may not now be raised for the first time on this appeal. Conquy v. New Jersey Power & Light Co., 23 N.J. Super. 325, 333 (App. Div. 1952); Fink v. City of Paterson, 44 N.J. Super. 129, 139 (App. Div. 1957).
Were the question properly before us it would, apart from the disputed but unresolved factual issue as to whether either of the plant physicians informed decedent of the advisability of hospitalization, and other negligence issues not necessary to discuss for present purposes (see Dudley v. Victor Lynn Lines, Inc., supra (32 N.J., at p. 494)), have to be determined against petitioner anyway in view of the herein adjudicated absence of proof of causal connection between the general congestive heart disease, allegedly worsened by the doctors' negligence, and decedent's actual death.
Judgment affirmed.