253 N.J. Super. 397 (1992)
601 A.2d 1190
VERONICA POLLACK, ADMINISTRATRIX OF THE ESTATE OF JOHN POLLACK, DECEASED, PETITIONER-RESPONDENT,
v.
PINO'S FORMAL WEAR & TAILORING AND ERNEST POLGARDY, RESPONDENTS-APPELLANTS.
VERONICA POLLACK, PETITIONER-RESPONDENT,
v.
PINO'S FORMAL WEAR & TAILORING AND ERNEST POLGARDY, RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 1, 1991.
Decided January 28, 1992.
*399 Before Judges MICHELS, HAVEY and CONLEY.
Burton J. Jacowitz argued the cause for appellant Pino's Formal Wear & Tailoring (Braff, Ertag, Wortmann, Harris & *400 Sukoneck, attorneys; Burton J. Jacowitz, of counsel and on the brief).
Bernard A. Campbell, Jr. argued the cause for appellant Ernest Polgardy (Destribats, Campbell, Desantis & Magee, attorneys; Bernard A. Campbell, of counsel and on the brief).
Roland R. Formidoni argued the cause for respondent Veronica Pollack, Individually and as Administratrix of the Estate of John Pollack, Deceased (Lenox, Socey, Wilgus, Formidoni & Casey, attorneys; Roland R. Formidoni, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Respondent Pino's Formal Wear & Tailoring (Pino's) and respondent-employer Ernest Polgardy (Polgardy) appeal from two judgments of the Division of Workers' Compensation that awarded petitioner Veronica Pollack, individually and as administratrix of the Estate of her husband, John Pollack, deceased (Pollack), temporary disability benefits and dependency death benefits following an injury sustained by Pollack in the course of his employment with Polgardy.
Briefly, Carmelo G. Armano (Armano), the owner of Pino's, expanded Pino's in 1985 by putting an extension on the building and adding dry-cleaning services. The building contractor, Tony Spatachini (Spatachini), obtained a permit for the expansion of the Pino's building and did the roof work. All State Engineering designed the addition. Armano arranged for Polgardy to purchase and install the dry-cleaning machinery, including the necessary piping. According to Polgardy, he made all the arrangements to obtain the machinery and install it. After the machinery arrived, he hired Pollack to install the gas-fired burner and to hook up the press machines to the lines.
Polgardy would pick up Pollack each morning, drive him to Pino's and drop him off. He also picked Pollack up at Pino's *401 each night. Pollack was to work on the Pino's job for three days only and on the last day, he was injured.
Polgardy instructed Pollack as to what had to be done on the job and gave Pollack the materials to perform the job. While Pollack hooked up the lines on the machinery, Polgardy worked in the boiler room hooking up the boiler and gas pipes. Polgardy testified that Pollack took a break every half-hour and went to Rittman's Cafe for "two shots and a glass of beer."
According to Polgardy, on the day of the accident, he picked up Pollack at Rose's Bar. Polgardy worked in the boiler room while Pollack was "already finishing up the pressing machine." At approximately 10:00 a.m., Polgardy observed Pollack enter Rittman's Cafe through the back door. He followed Pollack into the bar and saw Pollack drinking two shots and a beer. Pollack told Polgardy that he would be back to work in ten minutes. When Pollack came back to work, he climbed a ladder extending up to the roof. While on the ladder, Pollack fell. Polgardy testified that nobody saw Pollack fall, but everyone heard him land on Polgardy's car.
On August 15, 1985, three days after the accident, Dr. Julius Hafitz admitted Pollack into St. Francis Medical Center. Pollack was very shaky, had alcohol on his breath and was in great pain when he arrived at the hospital. Dr. Hafitz testified that Pollack's admission diagnosis was "pre-delirium tremen, fractured ribs and rule out occult fracture, right ankle." Dr. Hafitz explained the course of Pollack's hospital stay as follows:
He was admitted as a patient with known chronic alcoholic abuse and who had injured himself several days before being admitted to the hospital. He was shaky, he was nervous, he had a tachycardia, he also had a heart murmur which later we found he had pleural effusion and we thought he was in heart failure at the time. He subsequently became irrational and was treated for delirium tremen[s] and sedated and given fluid, which was a different situation then  here is a man with pleural effusion, with fluid in both lung fields and yet you have to give him fluids in order to maintain his existence, really. We saw a few ecchymotic spots, which indicated some bleeding. He had an anemia, which certainly went along with his liver cirrohis. [sic]. He had a hard palapable [sic] liver and he was slightly jaundiced. He subsequently was gotten out of *402 his delirium tremen[s] and we noted that his blood count was dropping and that there was a drop in platelets, an increase in his prothrombin and thromboplasty type had increased in fibrinogen. Split products indicated that he had a disseminated intravascular coagulopathy.
Dr. Hafitz testified that Pollack suffered from an acute respiratory distress syndrome and that things went from bad to worse until Pollack lapsed into a coma and subsequently died. According to Dr. Hafitz, the immediate cause of Pollack's death was hepatic failure (i.e., failure of the liver to detoxify the blood). Further contributing factors in Pollack's death were: laennec cirrhosis of the liver due to alcoholism; alcoholism; ascites; delirium tremens due to alcoholism; dementia due to Korsakoff syndrome, which in turn is due to alcoholism; respiratory arrest; disseminating vascular coagulopathy; rib fractures; right calcaneus fracture and heart failure due to myocarditis, which was secondary to all of the above. Dr. Hafitz was of the opinion that "there is a causal relationship between the accident and the things that happened to this poor man and his subsequent demise." Dr. Hafitz explained that Pollack would not have died had it not been for his accident because Pollack would then have been able to walk and get a drink. However, according to Dr. Hafitz, because Pollack had the accident and could not walk, he stopped drinking and had delirium tremens, which lead to Korsakoff syndrome, which lead to myocarditis and laennec cirrhosis, then to liver failure and his death.
Petitioner filed two petitions against Pino's seeking lifetime and dependency workers' compensation benefits. She claimed that Polgardy was uninsured and, therefore, since Pino's was the general contractor, it was responsible for all workers' compensation benefits pursuant to the provisions of N.J.S.A. 34:15-79. Pino's thereafter joined Polgardy as an additional respondent with respect to each petition. The matters were consolidated for trial and the Division Judge, with the consent of counsel, bifurcated the trial so that the issues of compensability and liability were tried before the issues of disability and causal relationship. At the conclusion of the compensability *403 and liability trial, the Division Judge held that Pollack's accident was compensable; that Polgardy was Pollack's employer; and that since Polgardy did not carry workers' compensation insurance, Pino's workers' compensation insurance carrier was responsible to provide benefits to Pollack pursuant to the provisions of N.J.S.A. 34:15-79. At the conclusion of the disability and causal relationship trial, the Division Judge found that there was a causal relationship between Pollack's accident and his death and awarded petitioner dependency benefits and temporary disability benefits for the period from the date of the accident to the date of Pollack's death. These appeals followed, and were consolidated by this court.

I.
Pino's contends that the Division Judge erred in finding that Pino's was a general contractor for purposes of N.J.S.A. 34:15-79 and, therefore, responsible to Polgardy's employee Pollack for any workers' compensation benefits to which he was statutorily entitled. We agree and reverse both judgments entered against Pino's.
N.J.S.A. 34:15-79, in pertinent part, provides:
An employer who willfully fails to provide the protection prescribed in this article shall be guilty of a crime of the fourth degree. In cases where a workers' compensation award in the Division of Workers' Compensation of New Jersey against the defendant is paid at the time of the sentence, the court may suspend sentence upon that defendant and place him on probation for any period with an order to pay the delinquent compensation award to the claimant through the probation office of the county. Where the employer is a corporation, the president, secretary, and the treasurer thereof who are actively engaged in the corporate business shall be liable for failure to secure the protection prescribed by this article. Any contractor placing work with a subcontractor shall, in the event of the subcontractor's failing to carry workers' compensation insurance as required by this article, become liable for any compensation which may be due an employee or the dependents of a deceased employee of a subcontractor. The contractor shall then have a right of action against the subcontractor for reimbursement. [Emphasis added].
Under the clear and explicit language of N.J.S.A. 34:15-79, a contractor placing work with a subcontractor shall in the event of the subcontractor's failure to carry workers' compensation *404 insurance become liable for any compensation which may be due an employee or dependent of that subcontractor. This section requires the general contractor to make certain that the subcontractor insures his liability to pay compensation benefits as provided by the statute or else the general contractor himself will become liable to pay such benefits. This section, however, does not create the relationship of employer and employee as between the general contractor and the employee of the subcontractor. See Bertucci v. Metropolitan Construction Co., 21 N.J. Super. 318, 321, 91 A.2d 153 (App.Div. 1952); Corbett v. Starrett Bros., Inc., 105 N.J.L. 228, 231, 143 A. 352 (E. & A. 1928). Moreover, it has long been held in this State that an owner of property is not a contractor for Workers' Compensation Act purposes. See e.g., Cassano v. Aschoff, 226 N.J. Super. 110, 543 A.2d 973 (App.Div.), certif. denied, 113 N.J. 371, 550 A.2d 476 (1988); Brygidyr v. Rieman, 31 N.J. Super. 450, 107 A.2d 59 (App.Div. 1954); Gerber v. Sherman, 120 N.J.L. 237, 198 A. 762 (Sup.Ct. 1938), aff'd o.b., sub nom. Gerber v. Arrow Construction Co., 121 N.J.L. 587, 3 A.2d 583 (E. & A. 1939); Mittan v. O'Rourke, 115 N.J.L. 177, 178 A. 797 (Sup.Ct. 1935); Priby v. Lee, 15 N.J. Misc. 292, 191 A. 105 (C.P. 1936). In Mittan, supra, the former Supreme Court held that a landowner who was not engaged in the business of building but who was having a house constructed for his own use and occupancy and for that purpose let out the masonry, plumbing, carpentry and electrical work to different people by separate contracts was not a "contractor" within the meaning of the then Workmen's Compensation Law that "[a]ny contractor placing work with a subcontractor, shall, in the event of the subcontractor's failing to carry workmen's compensation insurance as required by this act, become liable for any compensation which may be due an employee or the dependents of a deceased employee of said subcontractor." The former Supreme Court reasoned:
Wilson was not in the business of building houses but had contracted with the several mechanics to have a completed house erected, the work being given out *405 in the several parts that go to make a completed structure. Each of the mechanics having the contract with Wilson, one for electrical work, another for carpenter work, & c., was a contractor in contemplation of law and so far as the record before us shows there was no subcontractor involved in the case at all. Now if Wilson had made one contract for the construction of the building he could not be called a "contractor" and the fact that the work was split up into parts does not alter the situation. [115 N.J.L. at 179, 178 A. 797].
Similarly, in Priby, supra, the former Court of Common Pleas held that a landowner, who erects buildings on his property for the purpose of selling them and who enters into several separate contracts with various contractors for plumbing, heating, masonry and carpentry to carry out that purpose, is not a "contractor" within the meaning of the Workmen's Compensation Law so as to be liable to an employee of the carpenter who failed to carry insurance. The court reasoned that the landowner entered into several separate contracts with various contractors, did none of the work himself and had no say in the hiring of the contractors' employees.
In Gerber, supra, our former Supreme Court held that a landowner who undertakes to erect a building on his land and gives the construction work to independent contractors in several parts is not a "contractor" within the purview of the then Workmen's Compensation Law, even though the building is intended for sale and is actually sold before completion but not until after the making of the contract with the injured employee's employer. The court reasoned:
This court has held that where, as here, a landowner undertakes to erect a building upon his lands, and lets the construction work to independent contractors in several parts, he is not a "contractor" within the purview of the cited statute. And this is so even though he supervises the work of the individual contractors with a view to securing conformance to stipulated plans and specifications, and reserves to himself the doing of some of the work essential to the whole. A subcontractor within the design of this statute has been defined as "one who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance." Mittan v. O'Rourke, 115 N.J.L. 177, 178 A. 797.
The statutory relationship did not subsist between the defendants when the contract for the mason work was made. And whatever change in Arrow's status was effected by its later agreement to sell and convey the lands and the unfinished dwelling house to Dorman, and to complete the construction work in *406 accordance with the specifications, it did not thereby become charged with the duty of satisfying Sherman's obligations under the Workmen's Compensation act, by reason of his failure to carry the compensation insurance required by the act of 1924, supra. [120 N.J.L. at 240, 198 A. 762].
More recently, in Brygidyr, supra, we held that where the building owner had the windows washed regularly by, and customarily made payment for such services to, a window washer who usually did the work himself, the building owner was not a contractor and the window washer was not a subcontractor at the time the window washer instructed a third person to clean the building's windows. Therefore, the building owner was not liable under the Workers' Compensation Act to the third person who fell while washing the windows. We reasoned:
A contractor within the intendment of the statute is one who contracts directly with the owner of a property for construction, or improvement, or repair, or work to be performed. Hence, under the circumstances of this case, Schwaben being the owner of the property could not have been a contractor. The washing of windows was not in the line of Schwaben's regular business, and the contention that it had contracted to keep the windows clean is without merit. As a matter of fact, the record discloses no contractual relationship between Schwaben and its tenants in any respect. To hold otherwise would mean that any property owner who contracted for services would be liable for injuries sustained by the contractor's employees. [31 N.J. Super. at 453-54, 107 A.2d 59].
Here, it is perfectly clear on this record that Pino's was not a contractor within the meaning and intendment of N.J.S.A. 34:15-79. Armano decided to expand Pino's building to include a dry-cleaning service. Armano relied on Polgardy's skill and knowledge in selecting, purchasing and installing the dry-cleaning machinery. After deciding to expand, Armano retained All State Engineering to design the addition and Spatachini to construct it. Spatachini obtained the building permit and hired construction help for electrical, heating and air conditioning work. After Spatachini completed the building, Polgardy undertook the task of installing the dry-cleaning machinery. As with Spatachini, Armano placed no restrictions on Polgardy. The relationship between Armano and Polgardy was that of owner and contractor, not general contractor and subcontractor. *407 Armano's only concern was expanding Pino's to include a dry-cleaning service.
We hold, therefore, that the Division Judge erred in holding that Pino's was a contractor within the meaning and intendment of N.J.S.A. 34:15-79 and subject to workers' compensation liability for the injury sustained by Pollack. Accordingly, the judgments of the Division awarding petitioner temporary disability and dependency benefits against Pino's are reversed.

II.
Contrary to Polgardy's claims, Pollack was his employee at the time of the accident. N.J.S.A. 34:15-36 defined "employee" as:

synonymous with servant, and includes all natural persons, including officers of corporations, who perform service for an employer for financial consideration, exclusive of casual employments, which shall be defined, if in connection with the employer's business, as employment the occasion for which arises by chance or is purely accidental; or if not in connection with any business of the employer, as employment not regular, periodic or recurring; provided, however, that forest fire wardens and forest firefighters employed by the State of New Jersey shall, in no event, be deemed casual employees. [Emphasis added].
To help determine if an individual is an "employee" within the meaning of N.J.S.A. 34:15-36 or an independent contractor, the courts developed two tests: (1) the "control test" and (2) the "relative nature of the work test." Smith v. E.T.L. Enterprises, 155 N.J. Super. 343, 350, 382 A.2d 939 (App.Div. 1978); see Condon v. Smith, 37 N.J. Super. 320, 117 A.2d 272 (App.Div. 1955), aff'd, 20 N.J. 557, 120 A.2d 460 (1956). These two tests are basically designed to draw a distinction between those occupations which are properly characterized as separate enterprises and those which are in fact an integral part of the employer's regular business. Smith v. E.T.L. Enterprises, supra, 155 N.J. Super. at 350, 382 A.2d 939. The courts have placed greater reliance upon the relative nature of the work test. Id.; Rutherford v. Modern Transport Co., 128 N.J. Super. 504, 509, 320 A.2d 522 (Law Div. 1974). For example, in *408 Condon v. Smith, supra, 37 N.J. Super. at 325, 117 A.2d 272, we explained the "control test" stating:
* * * The determinative factor as to whether a person is an employee or an independent contractor for the purposes of workmen's compensation is control; the relationship of master and servant exists whenever the employer retains the right to determine not only what shall be done, but how it shall be done. De Monaco v. Renton, 18 N.J. 352 [113 A.2d 782] (1955). [Emphasis added].
Under the control test, the actual exercise of control is not as determinative as the right of control itself. Mahoney v. Nitroform Co., Inc., 20 N.J. 499, 506, 120 A.2d 454 (1956). This is so because in many instances the expertise of an employee precludes an employer from giving him any effective direction concerning the method he selects in carrying out his duties. See Berkeyheiser v. Woolf, 71 N.J. Super. 171, 177, 176 A.2d 497 (App.Div. 1961) (citing Marcus v. Eastern Agricultural Ass'n, 58 N.J. Super. 584, 596-605, 157 A.2d 3 (App.Div. 1959) (Conford, J., dissenting), adopted upon reversal in 32 N.J. 460, 161 A.2d 247 (1960)).
In Smith v. E.T.L. Enterprises, supra, we discussed the "relative nature of the work test" as follows:
Under this test the court will find that an employer-employee relationship exists if the petitioner shows "substantial economic dependence" upon the "employer" and demonstrates that there is a "functional integration" of their respective operations. Caicco v. Toto Brothers, Inc., 62 N.J. 305, 310 [301 A.2d 143] (1973). As noted in Rossnagle v. Capra and Shell Oil Co., 127 N.J. Super. 507, 517 [318 A.2d 25] (App.Div. 1973), aff'd o.b. 64 N.J. 549 [318 A.2d 20] (1974), "the court will inquire into whether the work done by the petitioner was an integral part of the regular business of the respondent. If such is found then the court will determine that an employment relationship existed." (Emphasis added). Thus, application of this test requires the court to undertake an examination of the "employer's" business. [155 N.J. Super. at 352, 382 A.2d 939].
Although these two tests are the primary factors in determining whether an individual is an employee or an independent contractor,
Our courts have considered other factors in determining "status." In Clausen v. Dinnebeil, 125 N.J.L. 223 [15 A.2d 205] (Sup.Ct. 1940), where the petitioner, a carpenter, was hired to put a roof on respondent's house, payment to be $1 an hour for an 8-hour day, the court held the employment to be casual and not compensable. Cf. Otmer v. Perry, 94 N.J.L. 73 [108 A. 369] (Sup.Ct. *409 1919). In Hart v. Kimball, 122 N.J.L. 217 [4 A.2d 493] (Sup.Ct. 1939), the petitioner was engaged to complete a roofing job, payment to be $3 per "square" of shingle applied. He was told what was to be done, but not how to do it. The court held him an independent contractor. In Forrester v. Eckerson, 107 N.J.L. 156 [151 A. 639] (E. & A. 1930), and Fitzpatrick v. Haberman, 16 N.J. Super. 490 [85 A.2d 7] (App.Div. 1951), it was held that hiring for a single job rather than for recurrent employment is indicative of an independent contractor relationship. In Cappadonna v. Passaic Motors, Inc., 136 N.J.L. 299 [55 A.2d 462] (Sup.Ct. 1947), affirmed 137 N.J.L. 661 [61 A.2d 282] (E. & A. 1948), the petitioner, a carpenter, was hired to do carpentry work at $15 per day. He presented a weekly bill for his services and those of his helpers, no social security or unemployment compensation deductions being made from payments to him. He was free to work by whatever means he chose; and was held to be an independent contractor. Cf. Armitage v. Trustees of Mt. Fern. M.E. Church, 33 N.J. Super. 367 [110 A.2d 154] (Cty.Ct. 1954). [Condon v. Smith, supra, 37 N.J. Super. at 325, 117 A.2d 272].
Under the control test, Pollack unquestionably was an employee of Polgardy. Polgardy retained the right to determine the work that Pollack would perform and assigned Pollack to install the gas-fired burner. Polgardy provided Pollack with the tools to perform the job and transported Pollack to and from work. Moreover, Polgardy paid Pollack $15 per hour for the three-day job. Polgardy retained the right to determine what Pollack would do, how Pollack would do it and how many hours a day Pollack would spend performing the assigned task.
Furthermore, Pollack was Polgardy's employee even under the relative nature of the work test. Petitioner established Pollack's dependence on Polgardy. Pollack asked Polgardy about the availability of work because his own business was floundering. Pollack was in need of money and Polgardy hired Pollack at the rate of $15 per hour. Furthermore, the work that Pollack performed was an integral part of Polgardy's business. Polgardy's business involved the installation of dry-cleaning machinery and Pollack installed a gas-fired burner, which was a necessary component of the dry-cleaning machinery.
Consequently, the Division Judge correctly determined that Pollack was Polgardy's employee at the time of the accident, and, therefore, Polgardy was responsible to pay temporary *410 disability benefits to petitioner as administratrix of Pollack's estate.

III.
Finally, we are satisfied that petitioner failed to prove by a preponderance of the medical probabilities that Pollack's accident on August 12, 1985 was a contributing cause of his death on November 19, 1985. We are thoroughly convinced from our study of the record that the substantial credible evidence demonstrates that Pollack's death was caused by the effects of alcoholism and was not causally related to his work-connected accident. The Division Judge's conclusions to the contrary are clearly mistaken and so plainly unwarranted that the interest of justice demands intervention and correction. We hold to a "definite conviction that the judge went so wide of the mark, a mistake must have been made." State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). We are convinced that "the factual findings and legal conclusions of the [Division Judge] ... are so manifestly unsupported by [and] inconsistent with the competent, relevant and reasonably credible evidence [that they] offend the interest of justice." Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974) (quoting Fagliarone v. Tp. of No. Bergen, 78 N.J. Super. 154, 155, 188 A.2d 43 (App.Div.), certif. denied, 40 N.J. 221, 191 A.2d 61 (1963)); see also Formosa v. Equitable Life Assurance Society, 166 N.J. Super. 8, 20, 398 A.2d 1301 (App.Div.), certif. denied, 81 N.J. 53, 404 A.2d 1153 (1979).
It is fundamental that:
The burden is on a petitioner to establish that he suffered an accident arising out of and in the course of the employment. In a case of one suffering from a pre-existing disease which is potentially fatal, and death ensues, it is presumed that the death is the result of natural physiological causes, and the onus is on the claimant to prove by a preponderance of probabilities that the employment was a contributing cause of same. Ciuba v. Irvington Varnish and Insulator Co., 27 N.J. 127 [141 A.2d 761] (1958). A preponderance of probabilities may be established by circumstantial evidence which need not have the attribute of certainty, yet must evoke a presumption well founded in reason and logic, as *411 distinguished from guess or conjecture. Ibid. However, "accident" and "employment" are not synonymous. Ibid. Thus, it is encumbent upon plaintiff to prove, circumstantially or otherwise, an event or happening beyond the mere employment itself. Lohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156 [46 A.2d 439] (Sup.Ct. 1946). See also Ciuba, supra; Jacobs v. Kaplan, 56 N.J. Super. 157 [152 A.2d 145] (App.Div. 1959). [Black v. Mahoney Troast Const. Co., 65 N.J. Super. 397, 403, 168 A.2d 62 (App.Div. 1961)].
A petitioner's proof must provide a rational basis to support the hypothesis that an accident caused death. Calicchio v. Jersey City Stock Yards Co., 125 N.J.L. 112, 117, 14 A.2d 465 (Sup.Ct. 1940). "A petitioner is not required to prove his claim to a certainty. It is sufficient if the evidence establishes with reasonable probability that the employment caused or proximately contributed to the condition of disease of which he complains." Bober v. Independent Plating Corp., 28 N.J. 160, 168, 145 A.2d 463 (1958).
However, where it is claimed that an accident accelerated the development of a previously impaired condition, the evidence must be carefully scrutinized so that death consequent to disease alone does not constitute the basis for a compensation award. Ten Eleven Corp. v. Brunner, 135 N.J.L. 558, 53 A.2d 350 (Sup.Ct. 1947); see also Joseph Dixon Crucible Co. v. Law, 135 N.J.L. 528, 53 A.2d 215 (Sup.Ct. 1947). A petitioner must prove by a preponderance of the evidence that the preexisting condition was accelerated or aggravated as a result of the accident. Walck v. Johns-Manville Products Corp., 56 N.J. 533, 556, 267 A.2d 508 (1970). Where there is a preexisting disease, competent medical evidence is required to show that death resulted from the accident and not from the disease's normal progression. Baginsky v. American Smelt. & Refin. Co., 88 N.J. Super. 69, 210 A.2d 782 (App.Div.), certif. denied, 45 N.J. 588, 214 A.2d 27 (1965).
Applying these principles here, we are thoroughly convinced that there was no justification for concluding that Pollack's death from hepatic failure due to alcoholism was causally related to his work-connected fall. The claim in this case is ethereal. It cannot be disputed medically that Pollack died as a *412 result of the natural progression of acute alcoholism. Even Dr. Hafitz, petitioner's own expert, conceded that Pollack did not have to suffer trauma or stop drinking in order to experience delirium tremens. Dr. Hafitz's opinion that Pollack's accident prevented him from drinking and triggered his pre-delirium tremen syndrome and his ultimate demise does not provide a rational basis to support the hypothesis that Pollack's accident caused his death. The hypothesis advanced here transgressed beyond the line to which causation should be extended as a matter of common sense, fairness and policy. As our Supreme Court so aptly observed in a somewhat different context in Howard v. Harwoods Restaurant Co., 25 N.J. 72, 83, 135 A.2d 161 (1957) "[w]e would not adopt a causation in fact test which says with Benjamin Franklin that `For want of a nail ... a kingdom is lost.'" On this record there is no reasonable probability that Pollack's fall from the ladder contributed in any way to his death. His death was the natural progression of acute alcoholism. Therefore, the award of dependency benefits is reversed.

IV.
Accordingly, the judgments of the Division awarding petitioner temporary disability and dependency benefits against Pino's and the judgment awarding petitioner dependency benefits against Polgardy are reversed. The judgment awarding petitioner temporary disability benefits against Polgardy is affirmed.