**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1353-18T2

FOURNIER TRUCKING, INC.,

    Plaintiff-Appellant,

v.

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY (d/b/a
NEW JERSEY CASUALTY
INSURANCE COMPANY),

    Defendant-Respondent.

_____

Argued March 16, 2020 – Decided April 9, 2020

Before Judges Sabatino, Sumners, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-2953-16.

Denise Marra DePekary and Brad A. Baldwin argued the cause for appellant (Weber Gallagher Simpson Stapleton Fires & Newby, LLP, attorneys; Andrew L. Indeck, Brad A. Baldwin, and Denise Marra DePekary, of counsel and on the briefs).

Richard J. Williams, Jr. argued the cause for respondent (McElroy, Deutsch, Mulvaney & Carpenter, LLP,

attorneys; Richard J. Williams, Jr., of counsel and on the brief).

PER CURIAM

This litigation arises out of an insurance company's audit revealing that a policyholder had withheld material information about its operations and thereby underpaid its workers' compensation premiums. After a non-jury trial, the Law Division judge ruled that the policyholder had violated the workers' compensation fraud statute, N.J.S.A. 34:15-57.4. Pursuant to that statute, the judge ordered the policyholder to pay the insurer $145,231 in unpaid premiums, plus interest, costs, and counsel fees.

The policyholder appeals the trial court's final judgment on various grounds. The policyholder chiefly argues that the carriers it engaged to haul goods for its customers were not "subcontractors" within the meaning of N.J.S.A. 34:15-79(a). The policyholder maintains it therefore was not liable under that statute to provide coverage to employees of the fourteen carriers it used that lacked such workers' compensation coverage.

The policyholder also appeals a pretrial order granting partial summary judgment and dismissing its Consumer Fraud Act claims, which had alleged the insurer engaged in unconscionable practices by demanding certain documents in the audit process and by sharply increasing premiums.

2

We affirm.

I.

The rather complicated facts and procedural history are detailed at length in the trial court's extensive pretrial and post-trial written decisions, and we presume the parties' familiarity with those details. We summarize key portions of that background here.

A. <u>Fournier Trucking's Business</u>

The policyholder, plaintiff Fournier Trucking, Inc., describes itself as a freight forwarding company that facilitates the transport of goods for shipping companies. Fournier Trucking has a facility in East Rutherford, New Jersey. Shippers within New Jersey utilize Fournier Trucking's services to ship goods to other states primarily on the West Coast.

Fournier Trucking's president and owner is Thomas Fournier, who lives and works in Minnesota.[1] Fournier's daughter, Marlee Grady, is the company's vice president of operations. The operations manager is Shawn Gaetz.

According to the trial testimony of Grady and Gaetz, Fournier Trucking is hired and paid by the shipping companies. Shippers call upon Fournier Trucking when they must transport less than a full truckload of product, or when

---

[1] When we refer to "Fournier", we mean Mr. Fournier and not his company.

3

they must make deliveries to multiple locations that require few products. Fournier Trucking is hired to collect and consolidate freight locally, and then ensure that it reaches its final destination.

The shipping companies that hire Fournier Trucking pay one price for each shipment. The price covers both the consolidation and transportation of the goods at issue.

Fournier Trucking employs several drivers who perform the consolidation aspect of its services by collecting loads from its shipping company clients in the New York tri-state area and gathering them in Fournier Trucking's warehouse. For its out-of-state transportation services, Fournier Trucking hires what it refers to as "independent motor carriers" to haul freight to the West Coast.

Fournier Trucking identifies loads for transport and, based on the destination, offers them to the carriers. If a carrier accepts the load, Fournier Trucking directs the driver to a specific warehouse loading dock to procure the goods for transport. The decision to hire a carrier rests with Fournier Trucking, not the customer.

Fournier Trucking informs its customers that it does not ship the products itself and provides the customers with the contact information for the assigned

4

carrier.    Thereafter, Fournier Trucking regularly, but not exclusively, coordinates communications between the customer and the carrier.

Grady testified that Fournier Trucking exercises no control over whether particular carriers will accept or reject loads, or the specific routes chosen by carriers.  The company does not provide any of the equipment used by the carriers.  Fournier Trucking sends the customers an invoice that covers the entire process, and then separately pays the carrier for the transportation services.

As acknowledged by Grady, although Fournier Trucking relies upon motor carriers to haul its customers' freight, it maintains the ultimate responsibility to ensure the goods reach the destination.

The parties agree that neither the carriers nor the carriers' employees are Fournier Trucking employees.  As we confirmed at oral argument, to date no employees of Fournier Trucking or its carriers have filed a workers' compensation claim with the defendant insurer, New Jersey Manufacturers Insurance Company ("NJM").

Fournier Trucking has "transportation agreements" with the carriers it hires, which either party may terminate at any time.  At trial, NJM introduced an agreement between Fournier Trucking and a redacted carrier as a representative sample.   Under the agreement, Fournier Trucking must

compensate the carrier for transporting products and materials.  The agreement is non-exclusive, allowing Fournier Trucking to contract with multiple carriers. The agreement requires the carrier to employ licensed personnel and furnish and maintain its own equipment, and contains indemnification and liability assigning provisions.  In the agreement, the carrier is defined as an "independent contractor" that has "exclusive control and direction of the persons operating the equipment or otherwise engaged in such transportation services."

The agreement states that a carrier working with Fournier Trucking must maintain its own public liability insurance policies required by law.  The agreement specifically requires carriers to provide proof of workers' compensation coverage of their employees to Fournier Trucking.

B.  Fournier Trucking's Workers' Compensation Insurance Policies

NJM's role as Fournier Trucking's workers' compensation insurer arose from an assigned risk program administered by the New Jersey Compensation Rating and Inspection Bureau ("CRIB").  The Legislature created CRIB in 1917 to "[e]stablish and maintain rules, regulations and premium rates for workers' compensation and employers' liability insurance and equitably adjust the same, as far as practical, to the hazard of individual risks, by inspection by the bureau." N.J.S.A.  34:15-90.2(f).   CRIB  also  develops  the  New  Jersey  Workers'

6

Compensation and Employers' Liability Insurance Manual (the "CRIB Manual"), which sets forth rules for workers' compensation insurance coverage. N.J.S.A. 34:15-90.2(i) to -90.2(j).[2]

In 2003, Fournier Trucking applied to CRIB for an assigned risk workers' compensation policy after failing to obtain such insurance through the voluntary market. The State granted the application, designating NJM as the insurance company for Fournier Trucking's workers' compensation insurance policy.

At trial, Fournier testified that, when submitting the 2003 insurance application, he represented that neither Fournier Trucking nor any of its contracted businesses used owner-operators or had hauling contracts.

NJM continued to insure Fournier Trucking's New Jersey operations in subsequent years.

The annual premium for Fournier Trucking's workers' compensation

---

[2] As we note, infra, we do not need to reach the thorny legal question of the validity of the rules and Manual, which are issued by CRIB without adherence to the public notice-and-comment processes prescribed under the Administrative Procedure Act ("APA"), N.J.S.A. 52:14B-1 to -31. In Aetna Insurance Co. v. Trans America Trucking Service, Inc., 261 N.J. Super. 316, 328-29 (App. Div. 1993), we found that the Manual had "not been adopted as regulations under the [APA] and [did] not have the force or effect of law." However, in a later opinion in Romanny v. Stanley Baldino Construction Co., 142 N.J. 576, 581 (1995), the Supreme Court relied on the CRIB Manual, without addressing whether it had been properly adopted.

policy with NJM was based on the remuneration Fournier Trucking paid to its employees and to "all other persons engaged in work that could make [NJM] liable" for workers' compensation payments. Every year, NJM first set forth an estimated premium, and then subsequently modified it through a post-period audit process by analyzing the policyholder's records to obtain actual payroll information. The purpose of the audit is to determine the extent of the actual risk NJM incurred, so that the estimated premiums may be adjusted retrospectively. This estimate and audit system is consistent with the CRIB Manual.

For the first policy issued for the 2003-2004 period, NJM assigned senior premium auditor Estelle Cibiniak to conduct the audit. At that audit, after a discussion with Grady's predecessor, Cibiniak's understanding was that the drivers employed on Fournier Trucking's payroll were the only ones making deliveries out of state. She was not informed of the motor carriers utilized by the policyholder.

NJM conducted annual audits from 2004 to 2015, in which Fournier Trucking represented that it used no subcontracted work or owner-operators, and never mentioned anything about the independent motor carriers. During that time frame before 2015, Grady had never discussed the issue of subcontractors

with NJM, and NJM did not receive any information suggesting that Fournier Trucking used subcontractors. Fournier Trucking had provided the W-2 tax forms (reporting wages, salaries, and tips) for its own employees but had never provided names and addresses, tax forms, or proof of workers' compensation coverage for any of the carriers. According to the trial testimony of Henry H. Reese, the administrator of NJM's premium audit unit, before 2015 NJM had no knowledge of the carriers hired by Fournier Trucking.

C. The Audit of Fournier Trucking's 2014-2015 Workers' Compensation Insurance Policy

This case specifically involves the premium for the assigned risk workers' compensation insurance policy issued to Fournier Trucking by NJM for the 2014-2015 policy period, and the associated audit.

The parties' policy agreement obligated Fournier Trucking to maintain all records needed to compute the premium and to provide copies upon request. Fournier Trucking also agreed to let NJM "examine and audit all [its] records that relate to this policy" to collect information that "will be used to determine the final premium," and to inspect its workplace for issues related to insurability and premiums. Under the "assigned risk eligibility" endorsement included in the policy, one of the conditions to maintain eligibility for the assigned risk plan is Fournier Trucking's compliance with NJM's requests to audit and examine

records or inspect the workplace.

For Fournier Trucking's 2014-2015 policy, which was issued in April 2014, NJM initially estimated an annual premium of $43,193. The total estimated cost was $45,579. Subsequently, NJM assigned Cibiniak to audit that policy to determine the actual remuneration due.

In support of its summary judgment motion, NJM submitted certifications from Richard Micklovic, who worked as the assistant vice president for commercial lines at NJM, and Tiffany Steele, who works in NJM's workers' compensation underwriting department. In their certifications, Micklovic and Steele explained that in March 2015, NJM analyzed Fournier Trucking's history to determine whether to switch it from an assigned risk policy to a voluntary policy. According to Reese, voluntary policies are more affordable to the policyholder because they represent less risk.

As part of her review in 2015, Steele observed a discrepancy in the number of drivers reported by Fournier Trucking and the number of drivers for the company listed in a federal licensing database. That discrepancy prompted a physical inspection of Fournier Trucking's warehouse by NJM's underwriting department.

During the underwriting department's inspection, a Fournier Trucking

10

employee told the NJM inspector that Fournier Trucking used between fifteen and twenty independent motor carriers to complete its shipping services.

NJM became concerned by these revelations because, if Fournier Trucking utilized "subcontractors" that did not maintain their own workers' compensation insurance, NJM was exposed to risk as the insurer of the general contractor. As prescribed by N.J.S.A. 34:15-79(a):

> Any contractor <u>placing work with a subcontractor</u> shall, in the event of the subcontractor's failing to carry workers' compensation insurance as required by this article, become liable for any compensation which may be due an employee or the dependents of a deceased employee of a subcontractor. The contractor shall then have a right of action against the subcontractor for reimbursement.
>
> [(Emphasis added).]

On or about May 8, 2015, after receiving the information from the underwriting department's inspection, Cibiniak sent a letter to Fournier Trucking as part of her audit. Her letter requested all payroll information, a summary of all paid subcontractors, any tax forms issued to independent contractors (Form 1099s), and certificates of insurance. At trial, Cibiniak explained that she would ask for that information customarily as part of every audit.

According to Reese, the Form 1099s were necessary to determine the amount of NJM's exposure if the carriers lacked their own workers'

compensation coverage. He explained that the Form 1099s contained enough information for NJM to research whether the carriers had workers' compensation insurance using the CRIB website and, if not, the exact remuneration paid by Fournier Trucking for the purposes of determining the policy premium. At trial, Cibiniak similarly explained that Form 1099s were necessary so she could obtain the names of the carriers and research whether they maintained their own workers' compensation insurance policies. If so, that would remove them from the premium calculation.

During a subsequent telephone conversation on May 15, 2015, Cibiniak requested from Grady information regarding the payments that Fournier Trucking made to carriers. Grady responded that the drivers had their own separate businesses and their own insurance coverage, and she denied that they were subcontractors.

Immediately following the call with Cibiniak, Grady telephoned her father, who instructed her not to turn over any Form 1099s for the carriers. At trial, Fournier testified that he was aware that the carriers sometimes used multiple drivers, and that the carriers would have been required to maintain workers' compensation insurance for their employees, but he chose not to relay that information to NJM. He testified that NJM "wouldn't listen" to his

12

explanation of "what we do," so he decided to "let them discover it."

Grady and Cibiniak spoke again four days later regarding NJM's request for documents. Grady responded that she would "see what I can do," although her father had already instructed her not to produce the information.

By July 2015, NJM still had not received any Form 1099s or certificates of insurance for the carriers utilized by Fournier Trucking for its audit. During a phone call on July 13, 2015, Cibiniak again asked for the documents. Grady declined, telling Cibiniak that Fournier Trucking would not provide any information regarding the carriers.

As a result of Fournier Trucking's failure to provide any information regarding its carriers, NJM initially estimated the remuneration paid by Fournier Trucking to the uninsured carriers as $100,000. According to Micklovic and Steele, NJM hoped that by making and communicating the estimate, Fournier Trucking would be encouraged to provide the information so the audit could be completed and corrected.

NJM released an audit report of the April 2014 to April 2015 policy period on August 10, 2015. Based upon the audit and NJM's then-existing estimations regarding the activity of the carriers, Fournier Trucking's total standard premium increased to $57,042, with the total audited cost identified as $70,980.

13

The adjusted premium was predicated upon the $100,000 sum that NJM then estimated Fournier Trucking had paid in remuneration to uninsured carriers. At trial, Reese explained that NJM uses one-third of the remuneration paid to uninsured subcontractors when calculating the premium, rather than the entire remuneration, in accordance with a formula in the CRIB Manual.

During an October 16, 2015 phone call between Grady, Gaetz, and Reese, Grady initially represented that Fournier Trucking issued no Form 1099s to any entities other than cleaners. Gaetz corrected her misstatement and informed Reese that Fournier Trucking does furnish some of the independent motor carriers with Form 1099s. Nevertheless, Grady repeatedly insisted that each carrier used by Fournier Trucking maintained its own insurance. Grady asserted that Fournier Trucking had all the confirming documents in its possession.

Reese stated to Grady and Gaetz that the $100,000 remuneration used to calculate the revised premium was just an estimate. He explained to them that the increased premium could be removed if Fournier Trucking provided the requested information regarding the carriers.

Through its counsel, Fournier Trucking sent a letter dated December 23, 2015 to NJM, objecting to the increased premium, but agreeing to continue payments under protest. The letter described Fournier Trucking's business in

detail and reported that the company contracted with sixty-four independent motor carriers. The letter also attached a sample copy of the company's carrier contract, which recited that carriers are required by Fournier Trucking to maintain their own workers' compensation insurance policies. Notably, Fournier Trucking's attorneys acknowledged in the December 2015 letter that the motor carriers used by the company "in certain cases employ their own employees."

During a conversation between Grady and Reese on February 4, 2016, Grady confirmed that Fournier Trucking possessed insurance certificates for the carriers. She repeatedly represented that Fournier Trucking had no Form 1099s for the carriers, despite Gaetz's previous admission to the contrary during the October 2015 phone call. Grady also represented that the carriers had no employees, despite Fournier Trucking's lawyers' previous admission to the contrary. She later admitted at trial that she had no basis for saying the carriers lacked employees and recanted her earlier statements and acknowledged that Fournier Trucking was, in fact, in possession of Form 1099s for some motor carriers in October 2015.

In that same conversation, Reese explained that NJM would have to once again adjust the premium because Fournier Trucking's lawyers had told NJM

that Fournier Trucking utilized sixty-four carriers. In response, Grady stated that the estimate of $100,000 would "easily" cover the remuneration paid to all sixty-four of Fournier Trucking's carriers. At trial, Reese explained he was "taken aback" by Grady's statement, because the $100,000 figure for sixty-four carriers "seemed awfully low" based on his experience.

In her own trial testimony, Grady stated that she had told Reese in February 2016 that $100,000 would "easily" cover the payments for all the carriers because she believed the carriers should not factor into the premium equation at all. However, she admitted that, at the time, she was aware that the remuneration paid to the carriers far exceeded $100,000.

Reese also explained to Grady during their February 2016 conversation that if the carriers did have employees but no workers' compensation coverage, Fournier Trucking would be responsible for that coverage under the applicable statutes. Conversely, if the carriers did in fact carry their own insurance, Reese advised Grady that NJM would not charge Fournier Trucking for any additional risk.

NJM did not receive any further information from Fournier Trucking after that conversation. As a result, on February 8, 2016, NJM released a re-audit of the 2014-2015 policy.

In this second audit, NJM declared a significantly higher total standard premium of $344,001, and a total audited cost of $426,359. The increase was the result of NJM recalculating the portion of the premium derived from the estimated remuneration paid by Fournier Trucking to its uninsured carriers. According to Micklovic and Reese, NJM recalculated the remuneration based upon the sixty-four carriers referenced in the December 2015 letter sent by Fournier Trucking's counsel.

Through a letter to NJM dated March 3, 2016, counsel for Fournier Trucking alleged that NJM had improperly classified its contracted motor carriers as persons to whom NJM may have liability under its workers' compensation coverage. Fournier Trucking demanded that NJM retract the imposition of additional premiums resulting from the classification, the reimbursement of previously paid additional premiums, and the renewal of its policy. Notably, in this letter Fournier Trucking's attorneys once more referred to the employees of the carriers, arguing that they would not qualify as employees of Fournier Trucking.

On March 9, 2016, NJM issued an earned premium notice to Fournier Trucking, identifying an outstanding balance of $380,780. Fournier Trucking continued making payments in 2016 "under protest" to avoid cancellation.

By the time Fournier Trucking commenced this litigation, NJM had still not received information from Fournier Trucking concerning Form 1099s or certificates of insurance for the carriers.

Later during discovery, Fournier Trucking provided a spreadsheet that listed, in anonymous fashion, eighty-one carriers it utilized. Of the listed carriers, fifteen had multiple drivers. Fournier Trucking also produced in discovery redacted certificates of insurance, identifying them by a number assigned to each carrier. The certificates for the fifteen carriers that had multiple drivers contained no proof of workers' compensation insurance.[3]

D. This Litigation

In April 2016, Fournier Trucking filed a verified complaint and order to show cause in the Law Division seeking preliminary and temporary restraints against NJM. The policyholder sought injunctive relief to maintain the status quo of its workers' compensation insurance coverage pending the litigation (counts one and two) and reimbursement of paid insurance premiums (count three).

As requested, the trial court temporarily restrained NJM from cancelling, refusing to renew, or increasing the premium of the workers' compensation

---

[3] As we will discuss, infra, that figure was later corrected to fourteen.

coverage. After an initial hearing, the court converted these measures to preliminary restraints to remain in effect during the pendency of the action.

NJM filed an answer and counterclaim. The counterclaim alleged breach of contract (count one), and sought compensatory damages, specific performance (count two) and declaratory relief (count three). The counterclaim also alleged that Fournier Trucking violated the civil liability portion of N.J.S.A. 34:15-57.4, the workers' compensation fraud statute, and sought damages (count four).

Fournier amended its complaint to add claims against NJM of breach of contract (count four), breach of the covenant of good faith and fair dealing (count five), violation of the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-2 (count six), and violation of the civil liability portion of the New Jersey anti-racketeering statute ("NJRICO"), N.J.S.A. 2C:41-4(c) (count seven).

E. Partial Summary Judgment

After certain discovery was conducted, NJM moved for partial summary judgment. In its motion, NJM sought dismissal of Fournier Trucking's second amended complaint and relief pursuant to the first three counts of its counterclaim.

The court granted NJM's motion on April 26, 2018, issuing a twenty-five-

page written decision.

With regard to Fournier Trucking's breach of contract claims (counts four and five), and NJM's breach of contract, specific performance, and declaratory judgment counterclaims (counts one through three of the counterclaim), the motion judge found the policy agreement between Fournier Trucking and NJM unambiguously granted NJM the authority to conduct an audit to assess the appropriate premium.

The judge also found that the policy obliged Fournier Trucking to cooperate with NJM's requests for information. NJM was "rightfully entitled" to information regarding the carriers in order to complete a premium audit of the policy. The judge held that Fournier Trucking breached the policy agreement by refusing to provide information. The judge dismissed counts four and five of the second amended complaint and granted summary judgment to NJM on the first three counts of NJM's counterclaim.

The judge dismissed the first three counts of Fournier Trucking's second amended complaint, which had sought temporary relief, as moot.

The judge also dismissed Fournier Trucking's CFA claim (count six of the second amended complaint). The judge ruled that the CFA does not apply to the auditing of workers' compensation insurance policies, and that even if it did,

20

NJM did not engage in any unlawful conduct because it requested documents it was entitled to receive under the terms of the policy.

Finally, the judge dismissed the NJRICO claim (count seven of the second amended complaint) because it found NJM could not be an NJRICO defendant as a matter of law and the claim lacked evidential support.[4]  As a result, the entirety of Fournier Trucking's second amended complaint was dismissed.

As a remedy for granting summary judgment on the first three counts of NJM's counterclaim, the court ordered Fournier Trucking to provide copies of information relating to its carriers, including all Form 1099s, unredacted certificates of insurance, and a list of names and addresses of the fifteen carriers that had multiple drivers.  It also declared that NJM is entitled to charge a premium for amounts paid to uninsured subcontractors pursuant to N.J.S.A. 34:15-79.  The only remaining issue was the fourth count of NJM's counterclaim, which alleged that Fournier Trucking violated the civil liability portion of N.J.S.A. 34:15-57.4, the workers' compensation fraud statute.

F.  NJM's Motion in Aid of Litigant's Rights and Further Discovery

In May 2018, NJM moved to enforce litigant's rights seeking compliance with the court's order for Fournier Trucking to produce discovery.  The motion

---

[4] Fournier Trucking does not appeal the dismissal of its NJRICO claims.

prompted Fournier Trucking to issue two letters providing NJM with Form 1099s for four of the carriers and unredacted certificates of insurance for the fifteen carriers.

The court granted the motion to enforce litigant's rights and ordered Fournier Trucking to either produce Form 1099s for the remaining eleven carriers, produce a report identifying the amounts paid to them, or be subjected to sanctions. The order warned that if Fournier Trucking failed to produce the information, an adverse inference could be applied against it at trial.

After finally receiving detailed information relating to the out-of-state carriers, NJM attempted to acquire information from them directly. Reese conducted a search of the CRIB website to independently determine whether those carriers had maintained workers' compensation insurance. Reese's search confirmed that the carriers lacked such insurance.

Through a cover letter dated June 15, 2018, Fournier Trucking produced to NJM a document setting forth the amounts paid for the eleven outstanding carriers in 2014. Collectively, the information provided by Fournier Trucking indicated that it paid approximately $2.59 million to the fifteen carriers at issue in 2014. Grady later confirmed that figure at trial. Further discovery-related motions were dismissed after trial as moot.

G. Trial

The parties agreed to waive a jury on NJM's workers' compensation fraud counterclaim, and to proceed to a bench trial. The trial was conducted before the same judge who had ruled earlier on the summary judgment motion and took place over two days in June 2018.

Reese and Cibiniak testified for NJM. NJM also called Gaetz and Grady as witnesses.

According to Reese's trial testimony, NJM had developed a new audited premium for the 2014-2015 policy in light of the information it had recently acquired from Fournier Trucking in discovery. Based upon the $2.59 million in remuneration paid by the policyholder to the fifteen uninsured carriers that had multiple drivers, Reese testified that the premium increase would be $148,237, which was less than the previously revised estimate that included sixty-four carriers.

After trial, Reese amended this testimony in light of the revelation that one of the fifteen carriers did, in fact, carry workers' compensation insurance. The new revised premium increase was $145,231, which the court used to calculate the damage award.

In her trial testimony, Grady asserted that she had refused to turn over

A-1353-18T2

information to NJM because her father instructed her so, and because Fournier Trucking believed that information relating to the carriers was irrelevant to workers' compensation insurance. She did admit that she had known during the audit that information relating to the carriers would impact the premium charged by NJM.

Plaintiff called Fournier as its sole witness. He testified about his company's attempts to procure workers' compensation insurance in the early 2000s, and his instructions to Grady not to turn over requested documents to NJM because, in his view, NJM had "no right to them." He also testified that Fournier Trucking had since obtained workers' compensation insurance through another insurer that did not charge any premium for the motor carriers.

H. The Trial Court's Decision and the Final Judgment Terms

The judge issued a thirty-four-page written post-trial decision on October 1, 2018. She issued the order for judgment on November 8, 2018, entering judgment in favor of NJM. The same day, the judge issued a decision regarding NJM's unopposed application for counsel fees.

In her decision, the trial judge rejected Fournier Trucking's argument that the carriers are not subcontractors and thus not includable in Fournier Trucking's remuneration total. She held the carriers hired or retained by Fournier Trucking

24

are subcontractors who "were hired to complete the shipping services that Fournier Trucking was contractually required to perform for its customers." The judge further concluded that the driver teams used by the carriers were the carriers' employees, which could be "reasonably and logically inferred" from the record.

The judge did not make explicit credibility findings about each of the witnesses individually. Her opinion did note that the demeanor of Gaetz, who prepared the 2014 spreadsheet and other company documents for the NJM audit, "was humble, straightforward and compliant." The judge recognized that Gaetz was in a difficult position of "facing his many bosses from the Fournier family who were sitting in the courtroom." The judge found "his testimony left a lucid impression of compliance with their directives, and as well as having been compliant with the court's orders."

By contrast, the judge observed that the testimony of Grady "was at times ambiguous [and] wishy-washy" and that she "had a fuzzy memory regarding [her] communications with NJM individuals." The judge noted that Grady "was new to the insurance coverage department at the company at the time of the audit and that her uncle had handled the insurance coverage issues in the past." Further, the judge found that Grady "appeared not to be certain in her testimony

regarding her handling of insurance issues."

As an example of Grady's unreliable knowledge, the judge cited Grady's admission at trial "that when she told Mr. Reese that the motor carriers had no employees, she, in fact, did not know that to be true and made an 'incorrect assumption.'" Moreover, as the judge further noted, Grady "further admitted that to this day she does not know whether the motor carriers have employees."

As another example, the judge found that Grady's trial testimony about whether $100,000 in renumeration would cover the carrier's payroll exposure "is not credible and belies what she said on the telephone [to Reese] over two years prior." The judge pointed out that Grady ultimately admitted that she knew Fournier Trucking "paid far more than $100,000 to its motor carriers" when she spoke with Reese in February 2016.   Quite succinctly, the judge found "[t]he paper evidence conflicts with her [Grady's] testimonial evidence."

The judge made no similar negative credibility findings about NJM's representatives who testified. The judge did observe that Reese, the administrator of NJM's workers' compensation premium assessment department, has been with NJM since 2000 and "is specifically knowledgeable in the audit process."  As for Cibiniak, the judge favorably noted she has "thirty-one years of auditing experience" with NJM, and that she had initiated and diligently

pursued the audit process of Fournier Trucking through correspondence and multiple documented telephone calls.

The judge did not comment on whether Fournier himself was credible, except the judge did underscore his insistence that NJM did not understand the nature of his business. The judge also found it significant that Fournier had personally directed Grady not to turn over the 1099 forms to NJM because they had never been requested in the past and were, in his view, irrelevant.

After reviewing the evidence, the judge concluded that NJM proved by a preponderance of the evidence that Fournier Trucking had purposefully and knowingly made misleading and false statements to NJM to avoid paying additional premium, and withheld information concerning the carriers, in violation of N.J.S.A. 34:15-57.4.

Regarding damages, the judge relied upon the following statutory provision:

> Notwithstanding any other provision of law, and in addition to any other remedy available under law, a person who evades the full payment of premiums pursuant to R.S.34:15-1 et seq. or improperly denies or delays benefits pursuant to R.S.34:15-1 et seq. is liable to pay the sum due and owing plus simple interest.
>
> [N.J.S.A. 34:15-57.4(c)(3) (emphasis added).]

Under that section of the statute, the judge held that NJM was entitled to unpaid

premium accounting for the carriers at issue.  The judge also relied upon N.J.S.A. 34:15-57.4(b), which allows an injured party to recover costs and attorneys' fees, in awarding the same.

The final judgment awarded NJM $254,329.17, which represented unpaid premium in the amount of $145,231, simple interest in the amount of $7,603.44, costs in the amount of $6,802.73, and attorneys' fees in the amount of $94,692.[5]

This appeal by Fournier Trucking ensued.

II.

On appeal, Fournier Trucking principally argues that the trial court erred in finding that it was liable under N.J.S.A. 34:15-79 to provide workers compensation coverage for the employees of the uninsured motor carriers it used for hauling shipments to its customers.  Fournier contends those carriers were independent contractors who cannot be its "subcontractors" for purposes of civil liability under N.J.S.A. 34:15-79.

Fournier further agues the trial court erred in dismissing its claims of unconscionable practices, arguing such claims are viable under the CFA as a matter of law, do not clash with the regulatory scheme, and are factually

---

[5]  The counsel fee award has not been appealed, subject to our ruling on the merits of the proven statutory violation.

supported.

We consider appellant's legal arguments de novo. <u>Kaye v. Rosefielde</u>, 223 N.J. 218, 229 (2015). By contrast, we defer to the trial judge's factual and credibility findings, so long as they are supported by substantial evidence in the record. <u>Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am.</u>, 65 N.J. 474, 484 (1974).

Having carefully considered the appeal in light of the record, our scope of review, and the applicable substantive law, we affirm the trial court's rulings and the final judgment. We do so substantially for the sound reasons set forth in the Judge Estela M. De La Cruz's detailed written opinion dated April 26, 2018 granting partial summary judgment, and her similarly comprehensive post-trial opinion dated October 1, 2018. We amplify the judge's analysis with some additional commentary.

## A.

The Workers' Compensation Act ("WCA"), N.J.S.A. 34:15-1 to -142, was enacted in 1911 to address "an increasing number of industrial accidents and the inadequacies of the common-law tort remedies that were available to aid injured workers." <u>Millison v. E.I. du Pont de Nemours & Co.</u>, 101 N.J. 161, 174 (1985). The statutory workers' compensation scheme is "designed to establish a no fault

A-1353-18T2

system of compensation for workers who are injured or contract a disease in the course of employment." Fitzgerald v. Tom Coddington Stables, 186 N.J. 21, 30 (2006) (quoting Brock v. Pub. Serv. Elec. & Gas Co., 325 N.J. Super. 582, 588 (App. Div. 1999)). It involves a "historic trade-off whereby employees relinquished their right to pursue common-law remedies in exchange for automatic entitlement to certain, but reduced, benefits whenever they suffered injuries by accident arising out of and in the course of employment." Millison, 101 N.J. at 174.

Pursuant to the WCA, "[w]hen employer and employee shall by agreement, either express or implied . . . accept the provisions of" the WCA, employers must compensate employees for work-related injuries "arising out of and in the course of employment . . . without regard to the negligence of the employer[.]" N.J.S.A. 34:15-7. Absent an express disclaimer, all parties to every employment contract are presumed to have accepted the WCA's provisions. N.J.S.A. 34:15-9. The WCA obligates any employer subject to its provisions to provide coverage for their employee's injuries. N.J.S.A. 34:15-71, -72. An injured employee entitled to benefits under the WCA is barred from any alternative means of recovery, including tort lawsuits. N.J.S.A. 34:15-8. The WCA is recognized as "remedial social legislation" that "should be given

liberal construction in order that its beneficent purposes may be accomplished." Cruz v. Cent. Jersey Landscaping, Inc., 195 N.J. 33, 42 (2008) (quoting Torres v. Trenton Times Newspaper, 64 N.J. 458, 461 (1974)).

The WCA defines the term "employee" as "synonymous with servant, and includes all natural persons, including officers of corporations, who perform service for an employer for financial consideration." N.J.S.A. 34:15-36. It does not define "independent contractors," which "are neither entitled to benefits nor subject to the limitations of the [WCA]." Estate of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 586 (2015).

Our courts have defined an independent contractor as "one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is accomplished, but only as to the result of work." Ibid. (quoting Auletta v. Bergen Ctr. for Child Dev., 338 N.J. Super. 464, 471 (App. Div. 2001)). Thus, the threshold determination under the WCA is whether an injured or deceased worker was an employee or independent contractor. Ibid.

This matter centers upon one particular aspect of the WCA that applies its coverage to contractors in certain circumstances. Under N.J.S.A. 34:15-79(a), the WCA obligates contractors to provide workers' compensation benefits to

injured employees of any subcontractors that lack workers' compensation coverage. "The statute is clearly intended to protect the injured employee directly, as well as to create an incentive for general contractors to police their sub-contractors' compliance with the workers' compensation law." Williams v. A & L Packing & Storage, 314 N.J. Super. 460, 467 (App. Div. 1998). It "requires the general contractor to make certain that the subcontractor insures his liability to pay compensation benefits as provided by the statute or else the general contractor himself will become liable to pay such benefits." Pollack v. Pino's Formal Wear & Tailoring, 253 N.J. Super. 397, 404 (App. Div. 1992). However, it "does not create the relationship of employer and employee as between the general contractor and the employee of the subcontractor." Ibid.

The WCA contains no definition of "subcontractor." As the trial court correctly recognized, the meaning of that term is at the heart of this case.

NJM concedes, and it is not in dispute, that Fournier Trucking's motor carriers are independent contractors. In its summary judgment decision, the trial court concluded that Fournier Trucking, not NJM, breached the workers' compensation policy agreement by refusing to produce information relating to its carriers, implicitly holding that the carriers are subject to the WCA. The court expanded upon its reasoning in its decision following the bench trial, in

32

which it explained that although the carriers are independent contractors, they are also subcontractors to Fournier Trucking within the meaning of N.J.S.A. 34:15-79(a), bringing them within the ambit of the WCA. The court's conclusion and reasoning is correct.

As set forth by Grady and Gaetz, Fournier Trucking is a business whose "freight forwarding" model involves contracting with local shipping companies to transport goods across the country. The shipping companies that hire Fournier Trucking pay one price covering both the consolidation and transportation of the goods at issue. Nothing in the record suggests that the shipping companies have any role in determining the means by which Fournier Trucking transports the goods. Rather, according to Grady, Fournier Trucking independently enters into agreements with carriers for that purpose, and then regularly coordinates communications between the shippers and carriers. Because the shipping companies that hire Fournier Trucking for individual shipments exercise little control over Fournier Trucking's transportation services, Fournier Trucking is clearly a "contractor" for those shipping companies within the meaning of N.J.S.A. 34:15-79(a).

Although the word "subcontractor" is not defined in the WCA, our courts have described a subcontractor under that statute as one "who enters into a

contract with a person for the performance of work which such person has already contracted with another to perform." Brygidyr v. Rieman, 31 N.J. Super. 450, 453-54 (App. Div. 1954). "In other words, subcontracting is merely 'farming out' to others all or part of work contracted to be performed by the original contractor." Ibid. That definition is consistent with the plain meaning of the term "subcontractor." See Black's Law Dictionary 1722 (11th ed. 2019) (defining subcontractor as "[s]omeone who is awarded a portion of an existing contract by a contractor, esp. a general contractor").

As the trial court correctly found, the relationship between Fournier Trucking and its carriers fits neatly into the "farming out" definition. Shippers hire Fournier Trucking to consolidate and transport goods; Fournier Trucking consolidates the goods itself, and then subcontracts with the carriers to perform the transportation. Therefore, Fournier Trucking is a contractor, and the carriers it uses to fulfill part of its contracts with shippers are subcontractors.

Fournier Trucking argues that the WCA does not apply to the carriers because they are "independent contractors." It relies upon the transportation agreements and the declarations in those agreements that carriers are independent contractors. This argument misses the mark.

NJM acknowledges that the carriers are not Fournier Trucking's employees for the purposes of applying a workers' compensation obligation to Fournier Trucking, and the record does not suggest otherwise. However, it is equally as clear that the WCA applies to the employees of carriers.

To the extent that the carriers maintain employees, those carriers are statutorily obligated to maintain workers' compensation coverage, as is any other employer within the state. By operation of N.J.S.A. 34:15-79(a), to the extent those carriers fail to satisfy their statutory obligation, Fournier Trucking, as the general contractor, is obliged to provide benefits to any carrier employee who suffers an injury while providing services under Fournier Trucking's general contract. See Eger v. E.I. Du Pont DeNemours Co., 110 N.J. 133, 137 (1988) (holding that N.J.S.A. 34:15-79 is designed to provide relief against general contractor to employees of subcontractor that violates statutory obligation to provide workers' compensation coverage).

Fournier Trucking's reliance upon the Supreme Court's decision in Kotsovska is unavailing. In that case, the decedent's estate filed a wrongful death action against the decedent's employer, who had negligently caused injuries that resulted in her death. 221 N.J. at 575. The employer argued that the decedent was his employee within the meaning of the WCA, which would

preclude recovery in tort. Ibid. The estate argued that the decedent was an independent contractor and could thus properly filed a wrongful death lawsuit. Id. at 575-76. Thus, at trial, the key issue for the jury was whether the decedent was an employee or an independent contractor. Id. at 578.

On appeal from this court's decision, the Supreme Court in Kotsovska reviewed two different tests to distinguish employees from independent contractors: the "control test" and the "relative nature of the work test." Id. at 592. The Court cited with approval the "hybrid test" it had previously adopted within the context of discrimination claims, which identified twelve factors for courts to consider when determining a worker's status. Id. at 594-95. It held that the same hybrid test would apply "in the context of a dispute over the applicability of the [WCA]." Id. at 595.

Here, Judge De La Cruz's well-reasoned post-trial decision explained that Fournier Trucking's reliance upon Kotsovska was "misplaced" because that opinion did not concern N.J.S.A. 34:15-79(a). Kotsovska concerned the distinction under the WCA between employees and independent contractors. As noted, the critical question here is not whether the carriers are Fournier Trucking's employees under Kotsovska. The issue is whether the carriers are subcontractors to Fournier Trucking under N.J.S.A. 34:15-79(a). The

36

<u>Kotsovska</u> Court did not cite N.J.S.A. 34:15-79(a), and nothing in that decision suggests any attempt to modify or otherwise disturb the unambiguous statutory language.

Fournier Trucking challenges the trial court's application of the "farming out" definition of "subcontractor" set forth in <u>Brygidyr</u>, 31 N.J. Super. at 453-54. According to Fournier Trucking, the "operative part" of the definition is that the task "farmed out" must be "one actually and routinely performed by a contractor or its employees." Fournier Trucking argues that because its employees do not perform long haul trucking, the carriers it hires to perform those services are not subcontractors.

In support of its position, Fournier Trucking mainly relies upon cases interpreting the definition of "subcontractor" in the Municipal Mechanic's Lien Law, N.J.S.A. 2A:44-64 to -124. Under that statute, a subcontractor is "a person having a contract under a contractor for the performance of the same work, or any specified part thereof." N.J.S.A. 2A:44-126.

In particular, Fournier Trucking relies upon <u>Morris County Industrial Park v. Thomas Nicol Co.</u>, 35 N.J. 522 (1961), a construction case that discussed the difference between a subcontractor and a materials supplier in construction projects. In that case, the Supreme Court concluded that, "[t]he emphasis is, of

A-1353-18T2

course, on the subcontractor being engaged to do all or some part of the Work, i.e., the construction itself, involving at least some labor in the installation of materials and not merely the supplying of materials." Id. at 534. The Court held that the alleged subcontractor was actually a materials supplier because he simply delivered supply fill dirt where the general contractor on the construction project ordered it dumped. Id. at 534-35.

Fournier Trucking's reliance upon Morris County is misguided. There, the issue was not whether the contractor's employees and alleged subcontractor's employees actually performed the same exact job duties. It was whether the alleged subcontractor performed part of the general contract, or simply supplied materials.

Here, Fournier Trucking contracts with shipping companies to consolidate and transport goods, and it then hires motor carriers to make the deliveries. At trial, Grady confirmed that Fournier Trucking owes a contractual responsibility to the shipper to ensure that the goods reach their destination, and the carriers are the means used by Fournier Trucking to accomplish that duty. Thus, the carriers perform "some part of the work" required under Fournier Trucking's general contracts.

A-1353-18T2

In a later case, the Supreme Court reviewed the meaning of the term "subcontractor" as used in the New Jersey Bond Act, N.J.S.A. 2A:44-143 to -147. Unadilla Silo Co. v. Hess Bros., 123 N.J. 268, 277-89 (1991). Although the Court recognized that the Bond Act did not define "subcontractor," it described the Mechanic's Lien Law as an analogous statute and looked to its definition, and Morris County, for guidance. Id. at 277-78. After reviewing foreign case law regarding the distinction between subcontractors and materials suppliers in construction projects, the Court developed the following "functional standard" to determine whether a supplier of materials is a subcontractor within the meaning of the Bond Act:

> 1) whether the material supplier agreed to perform a definite and substantial part of the same work that the general contractor was obligated to perform;
>
> (2) whether the work was performed according to plans and specifications in the original contract; and
>
> (3) whether the materials required off-site fabrication prior to installation at the job site.
>
> [Id. at 288-89 (emphasis added).]

The Unadilla standard, which Fournier Trucking neglects to mention in its brief, confirms that the "same work" requirement Fournier Trucking relies upon refers to the work set forth in the general contract. See also Twp. of Parsippany-

Troy Hills v. Lisbon Contractors, Inc., 303 N.J. Super. 362, 370 (App. Div. 1997) (holding that use of word subcontractor in Mechanic's Lien Act "contemplates protection only for work that is specific to the contract, would not have been performed but for the contract, and results in some labor which leads directly to the finished product.") (emphasis added). It is not a requirement that the general contractor's employees must perform the same exact functions as the subcontractor's employees. Thus, Fournier Trucking's carriers satisfy the definition of "subcontractor" posited by Fournier Trucking, because they execute a large part of the work Fournier Trucking agrees to perform in its contracts with shippers.

Fournier Trucking also cites to Gaydos v. Packanack Woods Dev. Co., 64 N.J. Super. 395 (Law Div. 1960). In that case, the general contractor hired an excavating company to perform an excavation. That company, in turn, leased a truck and driver from a subcontractor to do the excavating work. Id. at 397. An employee of the subcontractor was injured, and the court held that under N.J.S.A. 34:15-79, the excavating company was obligated to provide benefits. Id. at 404. It defined a subcontractor as "(o)ne who has entered into a contract, express or implied, for the performance of an act with the person who has already contracted for its performance." Id. at 400 (quoting Mittan v. O'Rourke,

115 N.J.L. 177, 179 (Sup. Ct. 1935)).  It also cited the "farming out" test.  Ibid.  Fournier Trucking argues that in Gaydos, unlike in this case, the subcontractor was supervised in a manner similar to an employee.  However, that does not mean that all subcontractors in all cases must be analogous to employees for N.J.S.A. 34:15-79 to attach.

Fournier Trucking also relies upon the outcome in Brygidyr, 31 N.J. Super. at 453-54.  In that case, we held that, under the WCA, the respondent was not a subcontractor.  Id. at 454.  However, we made that finding because the alleged general contractor was, in fact, the property owner, and not a contractor at all.  Id. at 453-54.  Thus, the respondent was the original contractor, rather than a subcontractor, and N.J.S.A. 34:15-79 did not apply.  Fournier Trucking's reliance upon the analysis in Brygidyr is plainly misplaced.

Fundamentally, both case law and common sense show the terms "independent contractor" and "subcontractor" are not mutually exclusive.  A company can choose to use its own workers to carry out its responsibilities, or it can retain independent companies who may also qualify as subcontractors to discharge some of those tasks.  When it does the latter, the law of our State requires the contracting company to assure that the subcontractor's employees have adequate workers' compensation insurance.  That is precisely why Fournier

Trucking's own contracts with the motor carriers required such coverage. Unfortunately, some carriers did not, requiring Fournier Trucking to serve as the backstop.

We have considered all of the other cases cited by Fournier Trucking in its brief. None of them persuade us that the trial court erred in determining that the fourteen motor carriers in question functioned as appellant's subcontractors, and that appellant was thereby obligated under N.J.S.A. 34:15-79 to assure their drivers had proper workers' compensation coverage if they failed to provide it.

The trial court had ample evidence to support its finding that Fournier Trucking violated the workers compensation fraud statute, N.J.S.A. 34:15-57.4(a)(2), "in making false and misleading statements that resulted in the avoidance of the full payment of premiums." The record contains sufficient proof, both direct and circumstantial, that the company acted through its agents in a purposeful and persistent effort to evade its statutory coverage responsibilities. See Bellino v. Verizon Wireless, 435 N.J. Super. 85, 96 (App. Div. 2014). We have no reason to second-guess the judge's first-hand assessment of appellant's deliberate course of conduct.

B.

Fournier Trucking separately argues that NJM lacked the authority to demand the carriers' 1099 forms and other documentation as part of the auditing process, and, moreover, that the NJM abused whatever authority it might have possessed by making onerous demands and escalating its premiums. As the trial court correctly recognized, these arguments utterly lack merit. We need not say much about them, except the following.

By its very nature, the premium calibration process used by the parties depends upon an audit after the insurance policy period has ended to determine the policyholder's actual transactional activities. Such a retrospective process requires the cooperation of the policyholder in the post-period audit. As the trial court rightly noted, Fournier Trucking agreed to such auditing and access to documents in the policy agreement itself. Its obligation to cooperate could not be plainer.

In an effort to refute these principles, appellant points to this court's decision in Aetna, 261 N.J. Super. at 316. According to Fournier Trucking, that case is "dispositive" regarding NJM's authority to conduct an audit, seek records, and charge a higher premium. We beg to differ.

In Aetna, the insurer had filed a lawsuit to recover additional workers' compensation insurance premiums from the defendant trucking company. Aetna, 261 N.J. Super. at 319. Similar to this case, Aetna's practice was to estimate the premium for the policy, and then audit the payroll at a later date to adjust the premium to reflect actual risk exposure. Id. at 320-21. The dispute arose from Aetna's attempt to charge additional premium based on the trucking company's use of "outside truckers" in addition to its regular full-time drivers. Id. at 321.

The trucking company considered the outside truckers to be independent contractors for whom it owed no obligation to provide workers' compensation coverage. Id. at 324. Accordingly, for the policy period at issue, the company refused to produce any payroll records for the outside truckers. Id. at 322. Aetna nonetheless estimated payments to the outside truckers, included them in its estimated premium charge, and then sued when the trucking company refused payment. Ibid. It relied solely upon the CRIB Manual's "Hired Vehicles" rule, which, among other things, required remuneration paid to owner-operator drivers to be included in the premium calculation. Id. at 320-21. In discovery, Aetna conceded that the outside truckers were independent contractors, yet still

sought to charge premium for them as owner-operators under the Hired Vehicles rule. Id. at 322-23.

Notably, Aetna's policy made no reference to the Hired Vehicles rule. Id. at 329-30. Aetna conceded in discovery that the truckers were independent contractors yet continued in its attempt to charge premiums. Id. at 330. We noted that Aetna could not assume that the outside truckers were employees because of the mere possibility that they may claim employee status in the future. Ibid. Because the trucking company's contracts established the outside truckers as independent contractors, the burden was on Aetna to disprove that status before charging premium for them as employees. Ibid. If an outside trucker ever attempted to recover workers' compensation benefits as an employee of the trucking company, Aetna would have the right to adjust the premium to account for that employee. Ibid.

Here, Fournier Trucking argues that NJM issued a "preemptive" premium increase based on "speculation," contrary to Aetna. In Aetna, the insurer included the outside truckers in its premium estimate without any proof that those contractors were employees, after receiving information that they were independent contractors, based solely on the Hired Vehicles rule. The insurer had no basis in the WCA or the policy itself to examine payroll records for what

it knew were not employees. Critically, N.J.S.A. 34:15-79(a) was not cited in Aetna because Aetna did not seek to charge premium for the outside truckers as subcontractors.

Here, on the other hand, NJM does not dispute that Fournier Trucking's carriers are independent contractors, and unlike Aetna, does not seek to charge premium by treating independent contractors as employees. Rather, NJM's grounds for increasing the premium are twofold: (1) an unambiguous statute, N.J.S.A. 34:15-79(a), which requires Fournier Trucking to provide benefits for injuries suffered by its uninsured subcontractors' employees, and (2) the policy agreement, which allows NJM to charge premiums based on the remuneration Fournier Trucking pays to anyone to whom NJM must provide workers' compensation benefits.

NJM was entitled under the statute and the plain language of the policy to request information and charge premium relating to those carriers. And, to its credit, NJM only made an estimated premium increase after several months of attempting to obtain the relevant records, in response to Fournier Trucking's non-cooperation.

Fournier Trucking construes Aetna to mean that the WCA cannot apply to the carriers until a motor carrier or one of its employees files a workers' compensation claim. That is misreading of the opinion.

In Aetna, we rejected the insurer's argument that the trial court should have applied the tests for determining the existence of an employer-employee relationship. Aetna, 261 N.J. Super. at 327-28. We stated that, "[s]ince no trucker has claimed to have been an employee, there is no specific claimant against whom" the employer-employee test can be applied. Id. at 328. Fournier Trucking's reliance upon this quoted language is misplaced. In Aetna, the insurer conceded that the outside truckers were independent contractors yet attempted to charge premium anyway. In this case, NJM was aware that Fournier Trucking used subcontractors, but it lacked information regarding the status of those companies and the remuneration they received solely because of Fournier Trucking's refusal to provide it, in violation of the express policy language.

Relatedly, Fournier Trucking also argues that under Aetna, the trial court erred because no evidence supports the court's conclusion that the drivers for the carriers at issue were the "employees" of the carriers. This argument also fails.

In her post-trial decision, Judge De La Cruz found that the relationship between the carriers and their drivers "can be reasonably and logically inferred." The judge noted the evidence that the fifteen carriers at issue included teams of drivers to complete shipments. The spreadsheet of carriers produced by Fournier Trucking in discovery, and the shipping manifests introduced at trial confirm that the carriers at issue utilized teams of drivers to complete deliveries, as explained by Gaetz's trial testimony. Further, the December 23, 2015 letter sent by Fournier Trucking's counsel to NJM states that the sixty-four carriers hired by Fournier Trucking "in certain cases employ their own employees." Fournier Trucking's counsel sent another letter dated March 3, 2016, that also referenced the carriers' employees. Therefore, the record supports the court's conclusion that the fifteen carriers that employed teams of drivers indeed had employees.

The identity and location of the carriers was exclusively within Fournier Trucking's control. It is untenable for Fournier Trucking to now criticize the trial court's finding of fact regarding employee status on the basis that it did not have enough evidence in its summary judgment decision. The court resorted to making inferences from the record solely because Fournier Trucking refused to provide more detailed information relating to those carriers. The record plainly

reflects that Fournier Trucking informed NJM of the names of its carriers only after the court granted partial summary judgment to NJM, when the court ordered it to do so, and on the eve of trial. At the summary judgment stage, Fournier Trucking was required to produce evidence demonstrating a material issue of fact regarding whether the fifteen carriers at issue have employees. It failed to do so despite its ability to readily acquire that information. Fournier Trucking should not now benefit from its refusal to produce any information identifying the carriers in discovery prior to the summary judgment decision. Washington v. Perez, 219 N.J. 338, 352 (2014) (quoting Graves v. United States, 150 U.S. 118, 121 (1893)) ("[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.").

Fournier Trucking further argues it was entitled, under Aetna, to a presumption that its carriers are independent contractors. It claims that, like in Aetna, NJM had the burden to disprove the independent contractor status of its carriers. However, as noted repeatedly, NJM's asserted basis for the premium increase did not depend upon characterizing the carriers as employees rather than independent contractors. NJM relied upon N.J.S.A. 34:15-79(a) and thus

had no need to disprove the carriers' independent contractor status, which is not in dispute.

Finally, citing Aetna, Fournier Trucking claims that "fairness" forbids NJM's premium increase. We disagree.

In Aetna, this court reasoned that the insurer could simply wait until an outside trucker filed a workers' compensation claim against it and deny the claim by arguing that the outside trucker was an independent contractor. Aetna, 261 N.J. Super. at 330-31. In other words, the insurer was attempting to have it both ways by charging a premium for the outside truckers to account for the risk that they would file claims as employees, while having the ability to deny those claims by arguing that they were independent contractors.

In this case, NJM was required by statute to provide benefits if Fournier Trucking utilized subcontractors that have employees but lack coverage. Thus, NJM had a clear entitlement under the policy to collect information regarding those subcontractors to determine the extent of its exposure to risk, and to charge premium to account for that risk. It was Fournier Trucking's defiant refusal to provide any information that constituted a breach of the agreement and resulted in litigation.

A-1353-18T2

The trial court's holding that NJM was entitled to collect information regarding the carriers and charge a premium accordingly therefore was correct under N.J.S.A. 34:15-79(a) and the plain terms of the policy agreement. The court's decision did not conflict with Aetna, or, for that matter, any other authority cited by appellant.

C.

Lastly, we need only say a few words about the dismissal of Fournier Trucking's claims against NJM under the CFA. Regardless of whether such claims are or are not preempted by state insurance regulatory scheme (and regardless of the precise legal status of CRIB and the CRIB Manual), we are satisfied that Fournier Trucking has presented no viable contentions that NJM's engaged in wrongful conduct that violated the CFA.

Fournier argues that NJM engaged in "unconscionable commercial practices," which are unlawful under Section 8-2 of the CFA. See N.J.S.A. 56:8-2. The trial court soundly rejected this argument.

"An unconscionable practice under the CFA 'necessarily entails a lack of good faith, fair dealing, and honesty.'" D'Agostino v. Maldonado, 216 N.J. 168, 189 (2013) (quoting Van Holt v. Liberty Mut. Fire Ins. Co., 163 F.3d 161, 168 (3d Cir. 1998)). Although the word "unconscionable" must be interpreted

51

liberally so as to effectuate the public policy of the CFA, the statute is not intended to "erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." Kugler v. Romain, 58 N.J. 522, 544 (1971).

In its briefs on appeal, Fournier Trucking only identities two examples of what it claims was unconscionable commercial conduct: (1) NJM's "arbitrary" increase of the premium estimate after the re-audit in 2016; and (2) NJM's "forcing" Fournier to purchase workers' compensation insurance coverage it was "not obligated to provide." Neither of these examples rise to the level of a CFA violation.

With respect to the first proffered example, the record demonstrates that NJM only issued the substantial increase in premium in 2016 after appellant's lawyer sent a letter to NJM that referenced sixty-four carriers. NJM thus increased its estimate based on the little information it received from Fournier Trucking itself, and in accordance with the policy agreement. Appellant could have avoided the issue—apparently readily—by complying with the policy agreement and producing all the requested information. At the direction of its president, it persistently refused to do so.

During litigation, after it became known that only fifteen of the subcontractors could have exposed NJM to risk under N.J.S.A. 34:15-79(a) because they had multiple drivers, NJM only sought a premium increase for those identified fifteen carriers. Its revised calculation reflects good faith, not bad faith. After trial, when NJM learned that one of those fifteen maintained workers' compensation insurance, it further adjusted its claim to unpaid premium for only fourteen carriers.

On the whole, NJM's conduct in revising the premium was fair and consistent with the policy agreement. Nothing suggests it engaged in unconscionable practices.

As to Fournier Trucking's second assertion that NJM unconscionably "forced" it to purchase coverage for workers "it was not obligated to provide," that argument is dispelled by our conclusion in Part II(A) that the motor carriers functioned as appellant's subcontractors. Under the plain terms of the policy, NJM was entitled to collect information and charge premium to account for this risk, under both the policy agreement and N.J.S.A. 34:15-79(a).

Lastly, as to one other example of alleged unfair dealing raised by appellant at oral argument, we discern no inherent unconscionability in the October 9, 2015 form letter from NJM's collections department notifying CRIB

that appellant had an unpaid outstanding premium balance. Although the letter incorrectly states that appellant's coverage had already been terminated by NJM, Reese explained that it was appropriate to advise CRIB that a policyholder in the assigned risk program owed an outstanding balance to its assigned insurer. Moreover, as it turned out, the letter did not prevent appellant from obtaining a policy from a different insurer.

### D.

All other points raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1353-18T2